[No. F050232. Fifth Dist. Apr. 10, 2007.]

SAN JOAQUIN RAPTOR RESCUE CENTER et al., Plaintiffs and Appellants, v.
COUNTY OF MERCED et al., Defendants and Respondents;
JAXON ENTERPRISES, INC., Real Party in Interest and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IV., V., VI. and VII.

## Counsel

Law Offices of Donald B. Mooney, Donald B. Mooney and Marsha A. Burch for Plaintiffs and Appellants.

James Fincher, County Counsel, and Walter Wall, Deputy County Counsel, for Defendants and Respondents.

Herum Crabtree Brown, Thomas H. Terpstra and Brett S. Jolley for Real Party in Interest and Respondent.

## Opinion

**KANE, J.**—San Joaquin Raptor Rescue Center, Protect Our Water and Le Grand Community Association (collectively Petitioners) appeal from the trial court's judgment denying their petition for writ of mandate. Specifically,

Petitioners challenge the decision by the Merced County Board of Supervisors (County) to certify the environmental impact report (EIR) and approve the conditional use permit (CUP) regarding a proposed expansion of an aggregate mining operation near the community of Le Grand (the Project). Petitioners contend the County's action was invalid under the California Environmental Quality Act (CEQA)[1] because the EIR allegedly failed to accurately describe the Project and its baseline environmental setting, failed to adequately address and/or mitigate certain environmental impacts, and failed to adequately consider project alternatives. The trial court denied the petition. We will reverse with instructions to grant the writ of mandate.

## BACKGROUND FACTS

Real party in interest, Jaxon Enterprises, Inc. (Jaxon), is owner of an existing aggregate mine and processing operation about four miles northeast of Le Grand in Merced County. The aggregate materials extracted from the site are used primarily for construction projects such as road construction. In 2000, Jaxon applied for CUP No. 99009 to allow for an expansion of the existing mine. The main purpose of the proposed expansion was to increase the acreage available for mining from 90 to 304 acres, so as to extend the productive life of the mine. This lateral expansion would increase the available aggregate reserves from 2.5 million tons to 7.8 million tons. It was estimated that the original 90-acre site could remain productive for only another five years, but with the additional acreage the mine could continue producing for about 30 years. Jaxon's proposal also sought to authorize occasional nighttime operations. The requested CUP would modify an already existing permit, known as CUP No. 3603, which had been issued in 1993.

After conducting an initial study, County planning staff determined that an EIR would be necessary and a notice of preparation was issued. In April of 2004, a draft EIR (DEIR) was prepared and released for public review and comment.

The DEIR sets forth the project description in sections 2.1 through 2.6 thereof. In section 2.1, the Project is initially described in the following terms: "The expansion includes the mining of additional acreage, *but is not proposed to substantially increase daily or annual production.*" (Italics added.) It is said the Project will provide for an additional 30 years of production at an average annual production of about 260,000 tons per year. Later, in section 2.3, the Project is described to allow a maximum production level of 500,000 tons per year. By way of comparison, section 2.4 discloses that the average

[1] Public Resources Code section 21000 et seq. All further statutory references are to the Public Resources Code unless otherwise indicated.

production rate over the past four years was only 240,000 tons per year, and the highest production rate reported was 312,890 tons per year in 1999.

The purposes of the Project are summarized in section 2.3 of the DEIR as follows: "The Applicant proposes to excavate and process 7.8 million tons . . . of aggregate material by: (1) expanding an existing aggregate surface mine laterally from 90 + acres to 304 + acres; (2) deepening the mining depth up to a maximum of 23 feet below surface elevation throughout the mine excavation area (except that areas to be developed into stockponds may be excavated to a depth of 38 feet); (3) modifying reclamation phasing from five to 20 + acre increments; (4) adopting a revised reclamation plan with dryland grazing as the end use (the same end use as that set forth in the existing reclamation plan); and (5) revising the Project's hours of operation to include occasional batch plant and loadout nighttime operations. The Project, as proposed, would involve surface disturbance to about 214 acres of 304 acres within the 471-acre site owned by the Applicant." The discussion of Project purposes includes a summary of geological studies indicating that there are limited reserves of concrete aggregate in the Merced County area.

Section 2.3 of the DEIR also sets forth Project objectives. Here, we find the provision for a "maximum" level of production of 500,000 tons per year. It is not specified whether 500,000 tons per year represents a significant increase in mining activity or production.

Some additional information regarding annual production is furnished in section 2.4 of the DEIR, which describes Project "operations" as follows: "The Applicant estimates that there are sufficient reserves at the Project site to support mining of between 200,000 and 500,000 tons of aggregate material annually for up to 30 years. The Project duration could be altered somewhat through the influence of market conditions, geologic factors, and technological improvements. . . . Although the mining rate would not exceed 500,000 tons per year, it could, in at least some years, be substantially less than that, according to historic mine production rates provided by the Applicant. Since taking over ownership of the Project in 1998, production at the existing mine has ranged from a low of 44,742 tons of marketed aggregate in that year to a high of 312,890 tons of marketed aggregate the following year (1999). Over the past three years, annual production rates have ranged from 150,541 tons to 305,911 tons. The average production over the past four years is about 240,000 tons per year. This is consistent with the Applicant's anticipated average yearly production rate of 260,000 tons, which is, in turn, consistent with an anticipated 30-year life-of-mine based on the known reserves of 7.8 million tons."

The DEIR also describes why the Project includes authorization of occasional nighttime operations. It states that typical mine operating hours would

be from 7:00 a.m. to 6:00 p.m., Monday through Friday. However, flexibility to operate during nighttime hours was being requested by the applicant because some public agency projects (such as Caltrans road improvement projects) operate during nighttime hours to prevent traffic congestion associated with lane closures, or to undertake emergency road repairs. Such road improvement projects may require materials to be supplied at night. If nighttime operations were approved, the asphaltic batch plant and truck loadout "could periodically operate 24-hours per day, and up to seven days per week for limited periods to service these projects." According to the DEIR, the duration of these expanded hours of operation "would depend on the duration of the projects being supplied." However, excavation from the mine area and rock crushing operations would occur "only during daylight hours."

The final EIR (FEIR) was issued in October of 2004. In addition to responses to public comments, the FEIR revised the air quality section of the EIR by analyzing emissions based on peak mining operations of 550,000 tons per year,[2] rather than the figure of 260,000 tons per year (as used in the DEIR).

On November 3, 2004, the planning commission approved the Project and certified the EIR. Petitioners appealed those determinations to the board of supervisors. On December 21, 2004, the board of supervisors considered and denied the appeal, approved the Project (CUP No. 99009), certified the EIR, and adopted its CEQA findings of fact, mitigation and monitoring program and statement of overriding considerations.

Petitioners then filed their petition for writ of mandate with the trial court, challenging the approval of the Project under CEQA. The trial court denied the petition and entered judgment for respondents. This appeal followed.

## DISCUSSION

### I. *CEQA Standard of Review*

"In reviewing challenges to the certification of an EIR or approval of a CUP, the court must determine whether the lead agency abused its discretion by failing to proceed in a manner required by law or by making a determination or decision that is not supported by substantial evidence." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390

---

[2] According to table 2.0-3 in the EIR, the maximum annual production rate (as mined) would be 550,000 tons, while the maximum annual production rate (as marketed) would be 500,000 tons. Some of the materials mined are not marketable, thus the higher number for the total amount mined. Here, the revised air quality section identified the annual maximum production by referencing the *as-mined* amount.

[133 Cal.Rptr.2d 718] (*Irritated Residents*); see § 21168.5.) "Courts are 'not to determine whether the EIR's ultimate conclusions are correct but only whether they are supported by substantial evidence in the record and whether the EIR is sufficient as an information document.' [Citation.]" (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1197 [22 Cal.Rptr.3d 203] (*Bakersfield Citizens*).) " 'Provided the EIR complies with CEQA, the [b]oard may approve the project even if it would create significant and unmitigable impacts on the environment.' " (*Irritated Residents, supra*, 107 Cal.App.4th at p. 1390.) The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it. (*Ibid.*)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues on which we granted review by independently determining whether the administrative record demonstrates any legal error by the County and whether it contains substantial evidence to support the County's factual determinations." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [53 Cal.Rptr.3d 821, 150 P.3d 709].)

"An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 405 [253 Cal.Rptr. 426, 764 P.2d 278].) "When assessing the legal sufficiency of an EIR, the reviewing court focuses on adequacy, completeness and a good faith effort at full disclosure." (*Irritated Residents, supra*, 107 Cal.App.4th at p. 1390.) Although CEQA "requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 26 [82 Cal.Rptr.2d 398].) Therefore, noncompliance with CEQA's information disclosure requirements is not necessarily reversible; *prejudice* must be shown. (*Bakersfield Citizens, supra*, 124 Cal.App.4th at pp. 1197–1198; § 21005, subd. (b).) " '[A] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' " (*Irritated Residents, supra*, 107 Cal.App.4th at p. 1391.) In such event, the error is deemed prejudicial "regardless whether a different outcome would have resulted if the public agency had complied with the disclosure requirements." (*Bakersfield Citizens, supra*, 124 Cal.App.4th at p. 1198.)

"The substantial evidence standard is applied to conclusions, findings and determinations. It also applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." (*Bakersfield Citizens, supra*, 124 Cal.App.4th at p. 1198.) Substantial evidence is defined in the CEQA Guidelines[3] as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) Substantial evidence includes facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts. (§ 21082.2, subd. (c); Guidelines, § 15384, subd. (b).) It does not include argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous, or evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment. (§ 21082.2, subd. (c).)

## II. *Project Description and Environmental Setting*

### A. *Project Description*

■ Petitioners challenge the adequacy of the Project description. Under CEQA, a "project" means *"the whole of an action,* which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Guidelines, § 15378, subd. (a), italics added; see also § 21065.) It refers to the underlying "activity" for which approval is being sought. (Guidelines, § 15378, subd. (c).) The entirety of the project must be described, and not some smaller portion of it. (*Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829–831 [173 Cal.Rptr. 602] [EIR for mining operation failed to include extension of water facilities, obscuring from view an important aspect of the project].) The Guidelines specify that every EIR must set forth a project description that is sufficient to allow an adequate evaluation and review of the environmental impact. (Guidelines, § 15124.) Among other things, a project description must include a clear statement of "the objectives sought by the proposed project," which will help the lead agency "develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings or a statement of overriding considerations, if necessary." (Guidelines, § 15124, subd. (b).) The description must also include "[a] general description of the project's technical,

---

[3] CEQA is augmented by state CEQA Guidelines, codified at title 14 of the California Code of Regulations section 15000 et seq. The state CEQA Guidelines will be referred to herein as Guidelines.

economic,. and environmental characteristics, considering the principal engineering proposals if any and supporting public service facilities." (Guidelines, § 15124, subd. (c).)

■ "[A]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 199 [139 Cal.Rptr. 396].) However, "[a] curtailed, enigmatic or unstable project description draws a red herring across the path of public input." (*Id.* at p. 198.) "[O]nly through an accurate view of the project may the public and interested parties and public agencies balance the proposed project's benefits against its environmental cost, consider appropriate mitigation measures, assess the advantages of terminating the proposal and properly weigh other alternatives . . . ." (*City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438, 1454 [263 Cal.Rptr. 340].)

Petitioners primarily argue that the Project description set forth in the DEIR is unstable and misleading because it indicates, on the one hand, that no increases in mine production are being sought, while on the other hand, it provides for substantial increases in mine production if the Project is approved. We agree.

As noted, the DEIR represents that the Project will expand the available acreage and allow for nighttime operations, but will not significantly increase annual production. It states: "The expansion includes the mining of additional acreage, *but is not proposed to substantially increase daily or annual production.*" (Italics added.) To highlight its "no increase" position, the DEIR reports that average production over the past four years was 240,000 tons per year, and indicates the Project will provide for an additional 30 years of mining at an estimated average production of about 260,000 tons per year. In contrast to these numbers, however, the proposed CUP would allow for annual mine production of 550,000 tons per year, which is more than double the production average over the prior four years. In other words, despite assurances to the contrary, the Project includes a substantial increase in mine production.

Although the DEIR does *also* indicate that Jaxon's mine would have a peak capacity of 550,000 tons per year (as mined) or 500,000 tons per year (as marketed), such statements were entirely inconsistent with the assurances elsewhere that there would be no increase in production. By giving such conflicting signals to. decision makers and the public about the nature and

scope of the activity being proposed, the Project description was fundamentally inadequate and misleading.[4]

Moreover, it is clear that this curtailed or shifting project description affected the EIR process. That is, much of the analysis assumes there will be production levels of only 260,000 tons per year. For example, in the traffic impact section of the DEIR, the discussion of long-term structural road impacts addressed only the effect of 260,000 tons per year, with no discussion of the impact of higher production levels. In the FEIR, one of the responses to comments indicates a comparison was being made between 260,000 tons per year and 240,000 tons per year, suggesting that only a slight increase in production was being considered. (See FEIR, § 4.2, response to 6-13.) Additionally, both the DEIR and FEIR state there will be no increase in groundwater pumping or consumptive water usage between the current operations and the proposed Project. However, it is not explained how there could be a major production increase to 550,000 tons per year without any increase in consumptive water usage. (See FEIR, § 4.1, responses to 2-8; DEIR, § 3.3.) It appears that the underlying assumption in the water analysis, and throughout much of the EIR, is that the Project does not provide for substantial increases in annual mine production from prior levels.

These curtailed and inadequate characterizations of the Project were enough to mislead the public and thwart the EIR process. As noted in *County of Inyo v. City of Los Angeles, supra*, 71 Cal.App.3d 185, when an EIR contains unstable or shifting descriptions of the project, meaningful public participation is stultified. "A curtailed, enigmatic or unstable project description draws a red herring across the path of public input." (*Id.* at pp. 197–198 [holding that although the "ill-conceived, initial project description" did not carry over into impacts section of EIR, the shifting description did "vitiate the city's EIR process as a vehicle for intelligent public participation"].)

---

[4] Although section 2.4 of the DEIR mentions both numbers, rather than bringing greater clarity, it only adds to the confusion. It assures the reader that although maximum production is 500,000 tons per year, "in at least some years" mine production "could . . . be substantially less than that." In the same paragraph the DEIR insists that average annual production will be only 260,000 tons. However, in order to achieve a 260,000-ton average, a 500,000-ton production year would have to be offset by an almost zero production year (or offset by several years' production of substantially less than 260,000 tons). This portion of the DEIR suggests that there will be 500,000-ton production years, but in at least some years mine production "could . . . be substantially less than that." The "could be" language implies there is only the possibility that there will be years in which production will be substantially less than 500,000 tons and yet simple arithmetic establishes that for every year in which production exceeds 260,000 tons, let alone approaches 500,000 tons, a correspondingly lower production year (or years) would be required in order to achieve no more than a 260,000-ton average over the 30-year period. These statements are at best confusing and at worst self-contradictory.

The public hearings reflect similar confusion about the level of production allowed under the Project. Before the board of supervisors, the Project applicant made the following assurances: "We're not talking about producing more material than we're producing now. . . . Our quantity that we're asking to be permitted to mine is the same as we've been permitted to mine in the past." Similarly, Mr. Steubing of Resource Design Technology, Inc., the consulting firm assisting in the EIR preparation, testified that "there's no additional operations. It's just existing baseline." Mr. Steubing had previously informed the planning commission that "there's nothing new from existing conditions." He even indicated regarding Jaxon's mine that "[t]hey *are* permitted to mine up to 550,000 tons a year." This later statement conflicts with the FEIR's response to comments, in which the County reported the existing permit would allow 240,000 tons per year.

In *City of Santee v. County of San Diego, supra*, 214 Cal.App.3d 1438, the Court of Appeal rejected an EIR for inconsistencies in the project description. In that case, the EIR evaluated a prison project using variable figures to determine the duration of the temporary facility—i.e., from three years to seven years to an indefinite length. Concluding that the EIR did not contain an accurate, stable and finite project description, the court held that the EIR could not "adequately apprise all interested parties of the true scope of the project for intelligent weighing of the environmental consequences." (*Id.* at pp. 1454–1455.) The same is true in the present case. The inconsistent description, which portrayed the Project as having "no increase" in mine production while at the same time allowing for substantial increases above recent historical averages, failed to adequately apprise all interested parties of the true scope and magnitude of the Project. For this reason, we conclude that the EIR in this case was insufficient as an informational document for purposes of CEQA, amounting to a prejudicial abuse of discretion.

Because the failure to provide a stable and consistent project description amounted to a prejudicial abuse of discretion, we conclude that the board's approval of CUP No. 99009 and its certification of the EIR were invalid and must be set aside. In the event that CUP No. 99009 is pursued further, we hold that a new EIR will have to be prepared and circulated, in order to clearly specify in the project description that the project includes and allows significantly increased production (over recent annual averages) up to a peak level of 550,000 tons per year.

B. *Baseline Environmental Setting*

█ Petitioners also contend that the EIR failed to adequately describe the existing environmental setting. "Before the impacts of a project can be assessed and mitigation measures considered, an EIR must describe the

existing environment. It is only against this baseline that any significant environmental effects can be determined." (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 952 [91 Cal.Rptr.2d 66].) The Guidelines state that an EIR must include a description of "the physical environmental conditions in the vicinity of the project" which constitute the "baseline physical conditions" for measuring environmental impacts. (Guidelines, § 15125, subd. (a).)

Although the baseline environmental setting must be premised on realized physical conditions on the ground, as opposed to merely hypothetical conditions allowable under existing plans (see *Christward Ministry v. Superior Court* (1986) 184 Cal.App.3d 180, 186–187 [228 Cal.Rptr. 868] [general plan amendment]; *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 246–247 [227 Cal.Rptr. 899] [rezoning]), established levels of a particular use have been considered to be part of an existing environmental setting. (See *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1274, 1278 [119 Cal.Rptr.2d 402] [existing airport operations]; *Fairview Neighbors v. County of Ventura* (1999) 70 Cal.App.4th 238, 242 [82 Cal.Rptr.2d 436] [established traffic levels from mine operations]; *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1196 [31 Cal.Rptr.3d 901].) "Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 125 [104 Cal.Rptr.2d 326].)

In *Fairview Neighbors v. County of Ventura*, the court allowed traffic numbers occurring when the mine operated at peak capacity pursuant to the prior CUP to be the "baseline," since mine operations were widely variable depending on market factors. The peak capacity (over 810 truck trips) was actually achieved in years prior, so it was not a mere hypothetical situation. The court rejected the appellant's claim that actual existing traffic numbers (at the time of the EIR) had to be used. (*Fairview Neighbors v. County of Ventura, supra,* 70 Cal.App.4th at pp. 242–243.) Thus, in the situation of an existing mine operation, a description of baseline environmental setting may reasonably include the mine's established levels of permitted use.

In the instant case, respondents claim to have used a four-year average of mine operations (i.e., 240,000 tons per year) as the baseline of the existing mine operations at the 90-acre site. Conversely, Petitioners contend that a more accurate baseline would be 100,000 tons per year, because (according to Petitioners) only 100,000 tons per year were permitted to be mined under the prior CUP (No. 3603). We agree with respondents that there is nothing in the administrative record to support Petitioners' contention that there was a 100,000-ton-per-year restriction under the prior permit. In fact, CUP

No. 3603 was not part of the administrative record below, and when respondents attempted to introduce CUP No. 3603 into the record in order to remove any doubt, Petitioners objected.

Since established usage of the property may be considered to be part of the environmental setting (*Fairview Neighbors v. County of Ventura, supra*, 70 Cal.App.4th 238), and such usage was adequately shown by the annual production averages, we believe there is substantial evidence in the record to support the County's use of 240,000 tons per year as a baseline for existing conditions on the 90-acre site.

■ The real problem, however, is that the EIR does not clearly identify the baseline assumptions regarding mine operations in its description of the existing environmental setting. In the introductory section of the DEIR a generalized statement is made that "existing conditions" include "the currently permitted extraction of aggregate materials" and processing activities, but the existing conditions are not defined or quantified. And although the four-year production average of 240,000 tons was apparently used in the impacts section(s) of the EIR, nowhere is that fact plainly stated. Such an omission clearly falls short of the requirement of a good faith effort at full disclosure. (Guidelines, § 15151.) The decision makers and general public should not be forced to sift through obscure minutiae or appendices in order to ferret out the fundamental baseline assumptions that are being used for purposes of the environmental analysis. "An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d at p. 405.) "The data in an EIR must not only be sufficient in quantity, it must be presented in a manner calculated to adequately inform the public and decision makers, who may not be previously familiar with the details of the project." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra*, 40 Cal.4th at p. 442.)

This failure to clearly and conspicuously identify the baseline assumptions for purposes of describing the existing environmental setting further degraded the usefulness of the EIR and contributed to its inadequacy as an informational document. Accordingly, we hold that in any new EIR prepared in connection with this proposed Project, the baseline must not be obscured, but must be plainly identified in the EIR.

III. *Specific Environmental Impacts and Mitigation Measures*

Next, Petitioners have argued that the EIR failed to adequately analyze impacts on water, traffic, air quality and biological resources.

■ "The fundamental purpose of an EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment.' (§ 21061.)" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th 412, 428.) Thus, an EIR must adequately identify and analyze the significant environmental effects of the proposed project. (§ 21100, subd. (b); Guidelines, § 15126.2, subd. (a).) In assessing the impact of a proposed project on the environment, the lead agency normally examines the "changes" in existing environmental conditions in the affected area that would occur if the proposed activity is implemented. (Guidelines, § 15126.2, subd. (a); see *Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273, 289 [41 Cal.Rptr.3d 420].) "Direct and indirect significant effects of the project on the environment shall be clearly identified and described, giving due consideration to both the short-term and long-term effects." (Guidelines, § 15126.2, subd. (a).) The degree of detailed analysis necessary in an EIR is summarized in the Guidelines as follows: "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.)

As a preliminary matter, we agree with Petitioners that it was necessary in this case for the EIR to include some analysis of the impacts that would result from peak levels of production. Peak mine operations of 550,000 tons per year was an aspect of the Project itself, as well as a reasonably foreseeable use, and thus the environmental effects thereof clearly had to be analyzed in the EIR. (See *Christward Ministry v. Superior Court, supra,* 184 Cal.App.3d at p. 194 [EIR must analyze entire development that is allowed by project's approval]; *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at pp. 396–399 [reasonably foreseeable future activity must be described and analyzed in EIR].) Consequently, one aspect of the analysis of environmental impacts that had to be considered in the EIR was the effect on the existing environmental conditions of substantial increases in annual mine production above baseline levels, including consideration of the reasonable potential of mine operations at peak levels of operation.

We now turn to the adequacy of the EIR's analysis of particular impacts.

A. *Impact of the Project on Water*

It is claimed by Petitioners that the EIR fails to adequately analyze impacts of the Project to groundwater supplies and surface water quality. We will begin with the discussion of groundwater impacts.

1. *Groundwater*

The EIR outlines that water used during mining and processing is "currently (and will continue to be) a combination of accumulated rainwater in the bottom of the excavation areas, flows from the perched groundwater table in the near-surface alluvium, and an on-site well." Overall water used for the Project is estimated as follows: "Although total Project water usage is about 500 gallons per minute (gpm), 10 hours per day (on average) most of this water is continuously recycled through the ponds and processing system. Make-up water comes from the on-site well . . . . In the summer months, the groundwater inflows to the excavation cease and the well becomes the principle source of make-up water. The maximum consumptive use of pumped water occurs from July through September." Annual consumptive water use is estimated as follows: "Based on information provided by the Applicant, current consumptive water use involves groundwater pumping at the rate of about 100 gpm for 10 hours per day, two days per week from July through September. Spread over a five-day work week, this consumptive water usage amounts to about 24,000 gallons per day, or approximately 2.2 acre-feet per month. There are no records of consumptive use or data on well production at other times of the year from which to derive the annual consumptive use in acre-feet per year; however, it can be estimated assuming consumptive use is proportional to the monthly climatic deficit (evaportranspiration [Eto] minus precipitation). By this method, the annual consumptive use is estimated to be 13.1 acre-feet per year (see calculation sheet in Appendix G-2, Estimated Consumptive Use by Month.)"

The EIR then concludes that "[n]o increase in consumptive water use is anticipated as a result of the mine expansion." The rationale provided for this conclusion is that when nighttime operations occur, rates of water usage would not increase because "nighttime operations would simply replace the usual daytime operations." Also, in the case of 24-hour operations for specific road or emergency projects, "the only processing equipment to operate longer-than-normal hours would be the asphaltic batch plant, which uses no water." Process water usage "is associated entirely with crushing operations."

The EIR then addresses, under "Impact 3.3-2," the concern that the Project may have a potential impact to deep groundwater supplies and could result in an increase in groundwater pumping during summer months, a time when

existing groundwater is also under high demand from neighboring wells. The EIR notes that known deep groundwater occurs in a five-foot-thick zone of sand layered between impermeable clay sediments at a depth of over 200 feet below ground surface. Although this aquifer is said to be "poorly character-ized," its "storage capacity and interconnections to aquifer(s) tapped by neighboring wells are unknown although it is apparent that the existing operation and neighboring uses have coexisted in a sustainable fashion for some time." Thus, the EIR concludes, "it can be assumed that pumping demand is less than or equal to recharge." For purposes of this conclusion, "the existing operation, including its current groundwater use, is considered part of the baseline condition for this analysis." The EIR acknowledges that well pumping is not metered, so the existing water extraction rate is based on estimates provided by the applicant.

The EIR notes that an increase in overall pumping rates and quantities could cause groundwater levels in neighboring wells to be adversely affected. However, the EIR reasons that because crushing activities would not occur at night, any increase in the hours of operation would not increase water usage. Thus, "water consumption is anticipated to remain at the current level."

Finally, the EIR concedes there is potential for stress on the deep aquifer during the summer months when agricultural pumping is also at a maximum. Allegedly, this would not be a "project-related change, but rather an ongoing condition." Further, the EIR notes that the aquifer has not been depleted so far, and has apparently recharged from year to year. "In general, a thin aquifer that is temporarily depressurized from short periods of high rates of pumping will typically recover when pumping ceases, so long as overall withdrawals balance with aquifer recharge." The EIR assumes that will continue to be the case here "given the historical sustainability of the deep groundwater supply."

However, the EIR recognizes that any increase in consumptive Project water usage "could affect the ability of the deep groundwater aquifer to sustain other existing consumptive uses," which is a potentially significant impact. Therefore, as a mitigation measure, it was required that the applicant "[m]aintain the current Project consumptive use (estimated by the Applicant as pumping 20 hours/week at 100 gpm or less from July through Septem-ber.)" (Italics omitted.)

Petitioners contend that the analysis of groundwater impact is inadequate because it fails to take into account and analyze the impact of substantially increased levels of production at the mine. We fully agree. The conclusion in the EIR that water consumption will remain at current baseline levels, even after production is dramatically increased to 550,000 tons per year, is not supported by substantial evidence or reasoned analysis. Moreover, the EIR's

analysis fails to show any correlation between the amount of water used and the level of production, and fails to identify how much groundwater would be used during baseline operations (i.e., 240,000 tons per year) in comparison to how much groundwater would be used during peak operations (i.e., 550,000 tons per year). Without such information, the impact of the project on groundwater supplies cannot be fully or accurately evaluated.

 A figure is put forward in the EIR as an estimate of consumptive use of groundwater—i.e., 2.2 acre-feet per month in July through September or approximately 13.1 acre-feet per year.[5] The estimate is apparently based on rates of groundwater pumping observed in July through September.[6] We conclude this information, without more, was inadequate to inform the public and decision makers regarding groundwater impacts. It is entirely unclear what these numbers actually represent for purposes of meaningfully evaluating the impact of the Project. As already noted, it is not shown whether the estimate of groundwater use per year is based on peak production, baseline production, or something else.[7] If it represents baseline production levels, what additional consumptive water use would likely occur during peak production, and in particular, how much additional groundwater would be needed to support the Project at that higher level of production? And what would be the impact of such increased groundwater pumping (when operating at peak production) on other water users who rely on the aquifer, including in dry rainfall years? Without such information, the true impact of the Project on groundwater supplies cannot be adequately evaluated. The EIR must include "facts to 'evaluate the pros and cons of supplying the amount of water that the [project] will need.' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th at p. 431; see *Santiago County Water Dist. v. County of Orange, supra,* 118 Cal.App.3d at p. 829 [EIR inadequate where impact of supplying water to mine not adequately analyzed].) Such facts have not been provided here.

Finally, although the EIR included as a mitigation measure that the Project must "maintain the current Project consumptive use (estimated by the Applicant as pumping 20 hours/week at 100 gpm or less from July through September)"[8] (italics omitted), a mitigation measure cannot be used as a device to avoid

---

[5] The annual amount is apparently arrived at after adjusting for monthly climatic variations.

[6] The information was apparently provided by the applicant. Petitioners argue that the EIR may not rely on this information merely because of its source. We disagree. Our focus is on the adequacy of the information provided in the EIR, not the fact that it came from the applicant.

[7] To put it differently, there is no substantial evidence to support a conclusion that the estimate represents *either* groundwater use when the project is operating at baseline production levels *or* when it is operating at peak production levels.

[8] How this mitigation measure would feasibly be monitored and enforced is not indicated. There is apparently no meter at the mine's groundwater well. Even if the groundwater use estimate were not doubtful and inadequate, the question of how future groundwater use could

disclosing project impacts. (*Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 195–197 [55 Cal.Rptr.2d 625].) An EIR must analyze the impacts of providing water to the *entire* proposed project (*id.* at p. 206), which in this case includes peak production of 550,000 tons per year. Since maximum production levels (approximately double the baseline) are specifically authorized by the proposed CUP, the EIR should disclose how much groundwater pumping would be needed to support such operations and analyze the impacts thereof. Under the circumstances, CEQA does not allow the EIR to simply assume, without substantial evidence or reasoned analysis, that the same amount of consumptive water will be used at maximum production as is currently being used.

For all the reasons stated above, we conclude that the EIR failed to adequately analyze the impact of the Project on groundwater supplies.

### 2. *Surface Water*

Petitioners contend that the EIR fails to adequately analyze impacts to surface water as a result of the Project's wastewater discharges. We agree. The EIR describes the mine operation as a "zero-discharge facility." It provides that the Project's conformance with the State Water Resources Control Board's storm water program will "result in the settlement of all accumulated runoff from operations in the on-site retention ponds," from which ponds the wastewater will be continuously reused in mine operations. The EIR details the surface water hydrology, including the ponding system which will protect against runoff of wastewater. Impacts and mitigation measures regarding wastewater discharge are described. However, it appears that only baseline production levels were considered. There is no analysis of the impact on surface water quality, including impacts from wastewater discharge, of significantly increased mine production. As with the analysis of groundwater impacts, the EIR's discussion of surface water quality was deficient because it failed to identify and analyze the impact (if any) of peak mine production.

### B. *Impact of the Project on Traffic*

Petitioners also contend the EIR failed to adequately analyze traffic impacts of the Project. Increased production at the mine would logically mean an increase in the number and frequency of the heavy 25-ton-capacity trucks traversing over the available roads used as haul routes. Petitioners primarily argue that the EIR failed to adequately consider the impact upon traffic and

be monitored and maintained at that level is a complete enigma. We also note it is unclear whether the mitigation measure applies only to groundwater pumping from July through September, or to an annual total.

road conditions of the mine's peak production rate of 550,000 tons per year, as authorized under the Project.

In discussing traffic impacts, the EIR considered annual traffic volumes generated by the Project based on the assumption of estimated average production of 260,000 tons per year, or 20,800 total truck trips (10,400 entering and 10,400 exiting). These numbers were used in evaluating the annual distribution of Project traffic on roads using the likely haul routes. As explained in the FEIR, an accepted methodology used by the California Department of Transportation to evaluate traffic index and design of pavement structural sections is to utilize average annual traffic volumes. The FEIR found it unnecessary to consider higher volumes of traffic, stating that "worst case" annual production levels would not occur *every* year.

This estimated annual average (i.e., 260,000 tons per year) was used in the analysis of the traffic index. The traffic index is a measure of equivalent single-axle loads expected over the design period, and is apparently used to evaluate whether the Project could physically degrade the county roadways. Because of expected wear of Project-related truck traffic on sections of Le Grand Road and White Rock Road, the impacts to these roads would be potentially significant. Consequently, as a mitigation measure the applicant (Jaxon) was required to reconstruct portions of Le Grand Road and White Rock Road to a performance standard of 8.5 on the design traffic index, in order to mitigate the impacts to the pavement structural section. (DEIR, mitigation measure 3.5-2a.)

Petitioners argue that in showing impacts from annual distribution of Project-related traffic on affected roads, the EIR should have used truck volumes based on maximum annual production of 550,000 tons per year. We note the purpose of this particular analysis in the EIR was to evaluate impacts to the road physical structures over long periods of time (i.e., 20 years) based on estimated annual truck volumes. (See FEIR, response 6-37.) That being the case, it was not improper in this instance for the EIR to consider an estimated average annual production of 260,000 tons, as one aspect of the analysis. However, that does not mean the analysis was complete, or that more was not required, under the unique circumstance here of huge variation in the Project description. In light of the widely shifting Project description in this case, which includes production levels as high as 550,000 tons per year, we hold that some analysis should have been made of long-term impacts on road physical structures based on the reasonable potential of greater frequency or regularity of annual mine operations at or near the maximum

production level of 550,000 tons per year.[9] Since this was not done, we agree with Petitioners that the EIR was inadequate in analyzing this impact.

In other aspects of the analysis, the EIR *did* consider traffic volumes that would correspond to maximum production levels. In analyzing peak traffic issues, the EIR used the mine's maximum capacity per day of 5,000 tons of material. Hypothetically, if production were maintained at that daily level throughout the year, it would substantially exceed the Project's maximum of 550,000 tons per year. As explained in the FEIR, the number was used in the intersection analysis of peak traffic as a "worse case scenario" which would be expected to occur few times, if any, during the life of the Project. By contrast, an average production day was estimated as only 1,000 tons of material.

■ In regard to said peak traffic analysis, Petitioners attack the assumption in the EIR that Project trucks would be evenly spaced throughout the eight-hour workday—i.e., exactly 24 trucks entering the site empty per hour, and exactly 24 trucks leaving the site full per hour. According to Petitioners, this assumption would possibly lead to underestimating potential impacts to traffic congestion during peak traffic hours. We reject Petitioners' argument. The EIR appears to have merely divided the daily truck volume to obtain a per hour average over the course of the workday. Petitioners offer no reason why this would be an unreasonable methodology in this case. Their argument is essentially that greater specificity was needed—i.e., that the EIR should have specified whether trucks sometimes enter and leave the site "unevenly" over time. We hold that such minute detail was not required in the analysis in question. The information provided was sufficiently detailed to allow reasoned analysis of the relevant impacts on peak traffic. It was not necessary that the analysis be so exhaustively detailed as to include every conceivable study or permutation of the data. (See Guidelines, § 15151 [information need not be exhaustive]; *Irritated Residents, supra,* 107 Cal.App.4th at p. 1396 ["CEQA does not require a lead agency to conduct every recommended test and perform all recommended research to evaluate the impacts of a proposed project"].)

■ As summarized by respondents, Petitioners have basically reiterated certain objections set forth in a study conducted by a consultant (Mr. Brohard) of LASER (Legal and Safety Employer Research, Inc.), a group opposed to the Project. This includes additional contentions regarding methodology, such as that Project trip generation should have been spread over a 270-day period,

---

[9] The EIR itself indicates that maximum levels of production are expected to occur (DEIR, § 2.4), and it appears reasonable that construction needs and resource scarcity may at times drive production to relatively high levels. On the other hand, we agree with respondents that it was unnecessary to assume maximum production would occur every year.

rather than 365 days, and that the month of September should not have been used to conduct traffic counts to determine existing traffic volumes. In each instance, Petitioners have failed to establish any showing that the County acted improperly in relying on the independent traffic study in the DEIR, and on the responses in the FEIR, rather than on Mr. Brohard's study, in determining whether the EIR adequately addressed traffic impacts. As this court has explained: "When experts in a subject area dispute the conclusions researched by other experts whose studies were used in drafting the EIR, the EIR need only summarize the main points of disagreement and explain the agency's reasons for accepting one set of judgments instead of another." (*Irritated Residents, supra*, 107 Cal.App.4th at p. 1391.)

To summarize, we conclude that the traffic impacts were not adequately analyzed in the EIR with respect to road structural impacts over time (including traffic index based on annual traffic volumes), due to the shifting and confusing Project description, thereby causing the EIR to fail in its role as an informational document. However, in all other respects the traffic analysis was adequate.

## C. *Impacts of Project on Air Quality*

Petitioners argue that the EIR failed to adequately analyze the impact of the Project on air quality. For the reasons noted below, we find Petitioners' argument to be without merit.

The DEIR contained a detailed and independent air quality analysis utilizing standards of significance established in the Guidelines. It described the existing environment and air basin, and analyzed potential impacts of the Project on air quality related to emissions (including pollutants), particulate matter, dust and odors. The air quality analysis was subjected to extensive comments, including claimed computational errors by LASER's air quality consultant (Petra Pless), which were responded to in detail in the FEIR.

However, in response to comments that the DEIR failed to adequately address air quality impacts of maximum production of the mine under the Project, the FEIR provided an "Errata" which included a *revised* air quality section with specific analysis of the impacts on air quality of mine production of 550,000 tons per annum. The DEIR had only analyzed air quality impacts based on the projected average production of 260,000 tons per year. Although the quantity of some emissions was higher in the Errata than originally set forth in the DEIR, the level of each individual and cumulative emission category remained below San Joaquin Valley Air Pollution Control District

thresholds of significance. Thus, even at the maximum production levels, the FEIR concluded potential impact of the Project on air quality remained less than significant.

Petitioners argue that the revised air quality analysis set forth in the Errata should have·been recirculated. We disagree. Because both the analysis in the DEIR and the Errata in the FEIR show the air quality impact to be less than significant, we agree with respondents that the standards for recirculation set forth at Guidelines section 15088.5 were not triggered. As the FEIR explains: "None of the changes provided·in· section 3.2 of this Final EIR contain significant new information that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the Project on a feasible way to mitigate or avoid such an effect."

D. *Impact of the Project on Biological Resources*

Petitioners next attack the adequacy of analysis in the EIR of impacts on biological resources and wildlife habitat. In particular, the discussion of vernal pools and burrowing owl habitats is challenged.

The EIR describes the presence of vernal pools and ephemerally wet drainage swales within certain areas of the Project site and vicinity. After identifying the potential impacts of the Project, it spells out a number of mitigation measures to prevent or minimize such ·impacts. The thrust of Petitioners' objections concern the adequacy of these mitigation measures. As discussed below, we find that the mitigation measures—although adequate in other respects—improperly defer formulation of significant aspects of mitigation, and therefore fail to comply with CEQA's informational requirements.

Numerous mitigation measures are specified in the EIR regarding the vernal pools and special-status species that are expressly presumed to exist there. To begin with, the vernal pools and swales would remain outside the limits of mining. The Project footprint would maintain a minimum 25-foot setback from the nearest vernal pools and ephemerally wet drainage swales. According to the analysis in the EIR, this 25-foot setback "should be adequate to maintain the hydrological integrity of these potentially important habitat types once Mitigation Measure 3.3-3 (installation of a cut-off trench) is implemented." To prevent potentially significant impacts ·on vernal pools if erosion or sediments ·from the mine area reached the vernal pools, various erosion controls and monitoring measures are· required as further mitigation measures. Preconstruction mitigation measures are also ·specified to allow mobile animal species to vacate the excavation areas prior to mining. Finally, although the initial reconnaissance or field survey did not detect the presence of certain special-status species in the area of the. vernal pools, the EIR

*presumes* that such species are present, and therefore imposes an additional 300-foot buffer. Protocol-level surveys will be conducted prior to any mining activity within 300 feet of vernal pool/swale areas. No mining activity within the 300-foot buffer would occur until specified conditions are met, namely (a) a protocol survey is conducted showing the absence of such species or (b) implementation of a management plan developed by a qualified biologist in consultation with appropriate jurisdictional agencies including California Department of Fish and Game and U.S. Fish and Wildlife Service. (See DEIR, mitigation measures 3.6-1a-c, 3.6-2a-d, 3.6-3a-c, 3.6-4a-b, 3.6.6a-b.)

As indicated by the above summary, the EIR allows some specifics of the overall mitigation effort to be developed in response to future protocol studies, prior to allowing phases of mining within the 300-foot setback. For example, under mitigation measure 3.6-3b, if the required spring season protocol survey shows existence of special-status plant species within or adjacent to the vernal pools, a management plan must be prepared by a qualified biologist to "maintain the integrity and mosaic of the vernal pool habitat." The plan will likely include such options as periodic mowing, rotational grazing, and weed abatement, as indicated in the EIR, and would require the concurrence of applicable regulatory agencies, including U.S. Fish and Wildlife Service and California Department of Fish and Game. It is only after such a management plan is developed and implemented that Jaxon could apply to the County for modification of the 300-foot buffer, leaving only the 25-foot setback. A similar approach would be used if special-status plant species are observed in the study of the grassland areas.

Petitioners argue that because the mitigation measures allow for *future* formulation of land management aspects of the mitigation measures, the EIR impermissibly *defers* the development of important mitigation measures until after Project approval. Guidelines section 15126.4, subdivision (a)(1)(B) specifies as follows: "Formulation of mitigation measures should not be deferred until some future time. However, measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way." According to Petitioners, to allow land management plans to be developed later fails to adequately inform the public and decision makers, prior to project approval, of the nature and efficacy of the proposed mitigation measures that will be undertaken. (See *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 307 [248 Cal.Rptr. 352].)

Respondents counter that this is not a deferral of mitigation. To the extent that some aspects of mitigation may be developed in subsequent management plans, it is (according to respondents) merely an example of using perfor-mance standards or criteria as expressly permitted under section 15126.4.

(Guidelines, § 15126.4, subd. (a)(1)(B); *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1028–1029 [280 Cal.Rptr. 478] [court upheld EIR that set forth a range of mitigation measures to offset severe traffic impacts where performance criteria would have to be met, even though some further study was needed and EIR did not specify which measures had to be adopted by city].)

On balance, we find that respondent's position is unpersuasive. Although a generalized goal of maintaining the integrity of vernal pool habitats is stated (see mitigation measure 3.6-3b), no specific criteria or standard of performance is committed to in the EIR. Nor does the EIR present several alternative mitigation measures, in which a selection of one or more of the described options is to be made after further study. Rather, after first *presuming* that special-status species will be present in or near the vernal pools,[10] the EIR leaves the reader in the dark about what land management steps will be taken, or what specific criteria or performance standard will be met, if this presumption is confirmed by the later protocol studies. The success or failure of mitigation efforts in regard to impacts on such vernal pool species may largely depend upon management plans that have not yet been formulated, and have not been subject to analysis and review within the EIR. The fact that the future management plans would be prepared only after consultation with wildlife agencies does not cure these basic errors under CEQA, since no adequate criteria or standards are set forth.

■ We recognize there are circumstances in which some aspects of mitigation may appropriately be deferred. " 'Deferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan. [Citation.] On the other hand, an agency goes too far when it simply requires a project applicant to obtain a biological report and then comply with any recommendations that may be made in the report. [Citation.]' [Citation.] If mitigation is feasible but impractical at the time of a general plan or zoning amendment, it is sufficient to articulate specific performance criteria and make further approvals contingent on finding a way to meet them. [Citation.]" (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 793 [32 Cal.Rptr.3d 177]; see also *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1448–1450 [91 Cal.Rptr.2d 322] [a deferred approach may be appropriate where it is not reasonably practical or feasible to provide a more complete analysis before approval and the EIR otherwise provides adequate information of the project's impacts]; *Sacramento Old City Assn. v. City Council, supra,* 229

---

[10] The EIR states: "The first tier [of the EIR's impact analysis] presumes that all potential special-status vernal pool plant and animal species do occur within the areas of suitable habitat on site."

Cal.App.3d at pp. 1028–1029 [deferral of agency's selection among several alternatives based on performance criteria was appropriate]; 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2006) § 14.10, pp. 702–706.) Here, however, no reason or basis is provided in the EIR for the deferral to a future management plan (or plans) of these particular mitigation measures, even though the EIR expressly presumes that special-status species will be present in the vernal pool or swale areas. Accordingly, we conclude that the analysis of mitigation measures with respect to special-status species in the vernal pool areas was inadequate, since it improperly deferred formulation of land management aspects of such mitigation measures.

As to the EIR's mitigation measures concerning burrowing owl habitat, we reach the same conclusion. The EIR admits such owls have nested in the area in the past (observed in 1999). The EIR presumes that burrowing owls nest and winter on the Project site, and states that the Project may cause direct and indirect impacts that are significant. In mitigation measure 3.6-7a, an area of 6.5 acres of grassland habitat with suitable burrows must be preserved, as recommended by the California Department of Fish and Game and the California Burrowing Owl Consortium. Further, at least 30 days prior to commencement of ground disturbance before each phase, a protocol survey for burrowing owls shall be conducted. If they are present, Jaxon must implement a plan for passive relocation of wintering owls, and maintain a minimum 250-foot buffer around nesting owls until a qualified biologist has determined that all young have fledged and are foraging independently. Finally, a qualified biologist shall prepare a management plan for the burrowing owl preserve, which shall be approved by California Department of Fish and Game prior to any mining and implementation of the proposed plan. Although many valid mitigation measures are described, no reason is given for deferral of the land management plan concerning the burrowing owl preserve, nor are any criteria or standards of performance set forth. We conclude the EIR improperly deferred formulation of this mitigation measure as well.

Finally, Petitioners note that in mitigation measure 3.6-2d, if the Project causes loss to functioning and value of vernal pool areas, there must be mitigation in the form of replacement by either creating vernal pools or swales within the conservation area on site, *or* by offsite purchase of wetland banking credits. Since there are no wetlands conservation banks present in the County of Merced, the latter alternative is unavailable. The FEIR acknowledges this fact, but emphasizes that the *other* option—i.e., creating new vernal pools in the conservation area onsite—remains a reasonable mitigation measure. And if mitigation credits become available within the watershed, the FEIR further explains, then "such acquisition would become an additional

available measure." In light of this clarification in the FEIR, Petitioners have failed to demonstrate this particular mitigation measure is inadequate or unsubstantiated.

IV.–VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VIII. *Prejudice*

" 'When the informational requirements of CEQA are not complied with, an agency has failed to proceed in a "manner required by law." ' [Citation.] If the deficiencies in an EIR 'preclude[] informed decisionmaking and public participation, the goals of CEQA are thwarted and a prejudicial abuse of discretion has occurred.' [Citation.]" (*Bakersfield Cititzens, supra*, 124 Cal.App.4th at p. 1220.)

■ In the present case, the EIR was fundamentally flawed due to a curtailed and shifting Project description, which meant that the public and decison makers were not adequately informed about the full scope and magnitude of the Project. The unstable description carried over into the impacts analysis, resulting in an understated and inadequate discussion of water and traffic impacts, as discussed herein. Compounding these errors, the baseline assumptions were not clearly identified. Additionally, the EIR improperly deferred formulation of mitigation measures with respect to protection of biological habitats of special-status species, and provided inadequate responses to certain comments. These deficiencies in the EIR were prejudicial because they precluded informed decisionmaking and public participation. Therefore, certification of the EIR was a prejudicial abuse of discretion.

■ As a result, the Project approvals must likewise be voided. As this court summarized in *Bakersfield Citizens, supra*, 124 Cal.App.4th at page 1221: "The Guidelines unequivocally require the lead agency to certify a legally adequate final EIR prior to deciding whether or not to approve or carry out a contested project (Guidelines, §§ 15089 to 15092.) '[T]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision makers, and the public, with the information about the project that is required by CEQA.' [Citation.] Thus, the project approvals and associated land use entitlements also must be voided."

---

*See footnote, *ante*, page 645.

## DISPOSITION

The judgment is reversed, and the action is remanded to the trial court with directions to grant the writ of mandate vacating County's certification of the EIR and its approval of the Project (including CUP No. 99009), based on the violations of CEQA as set forth herein. The trial court shall, in addition, issue orders that the Project may be considered for potential re-approval by the County, if a new, legally adequate EIR is prepared, circulated and certified in compliance with CEQA, including opportunity for public comment. Upon consideration of such new EIR, and in accordance with all applicable laws, the County may then determine whether or not to re-approve the Project. The County may require modification of the Project and/or additional mitigation measures as conditions of approval. Petitioners are awarded costs on appeal.[12]

Harris, Acting P. J., and Dawson, J., concurred.

On April 11, 2007, the opinion was modified to read as printed above.

---

[12] The petition for writ of mandate requested an award of attorney's fees pursuant to Code of Civil Procedure section 1021.5. We offer no opinion regarding Petitioners' entitlement to such fees. All such issues are remanded to the trial court.