Filed 1/12/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CITY OF LONG BEACH et al.,<br><br>      Plaintiffs and Respondents;<br><br>XAVIER BECERRA, as Attorney General, etc.,<br><br>      Intervener and Respondent,<br><br>v.<br><br>CITY OF LOS ANGELES et al.,<br><br>      Defendants and Appellants;<br><br>BNSF RAILWAY COMPANY,<br><br>      Real Party in Interest and Appellant. | A148993<br><br>(Contra Costa County<br>Super. Ct. No. CIVMSN140300) |

Defendants City of Los Angeles et al.[1] and real party in interest BNSF Railway Company (BNSF) appeal a judgment granting consolidated petitions by government and public interest entities[2] to set aside certification of the final environmental impact report (FEIR) relating to, and approval of, the proposed construction by BNSF of a new railyard approximately four miles from the Port of Los Angeles.[3] Environmental analysis of the

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 5, 6, 8, 10, and 11 of the Discussion.

[1] Other named defendants include the City Council of the City of Los Angeles, the Port of Los Angeles, and the City of Los Angeles Harbor Department (harbor department). Defendants are collectively referred to as the City of Los Angeles.

[2] Plaintiffs include City of Long Beach, South Coast Air Quality Management District, East Yard Communities for Environmental Justice, Coalition for Clean Air, Century Villages at Cabrillo, Natural Resource Defense Council, Inc., Coalition for a safe Environment, Apostolic Faith Center, Community Dreams, California Kids IAQ, Long Beach Unified School District, Fast Lane Transportation, Inc., California Cartage Company, Inc., Three Rivers Trucking, Inc., and San Pedro Forklift, Inc.

[3] Amicus curiae briefs have been filed by California Communities Against Toxics, California Safe Schools, Communities for a Better Environment, Del Amo Action

project dates back to at least 2005. The administrative record exceeds 200,000 pages, the FEIR exceeds 5,000 pages, and the trial court's opinions dealing with the multitude of issues raised below exceed 200 pages.

Appellants challenge the trial court's conclusion that the FEIR is deficient because it fails to analyze the impact of rendering capacity at BNSF's existing Hobart yard in the City of Commerce, some 24 miles from the port, available to handle additional traffic, arguing that the project description in the FEIR is misleading and that the FEIR fails to adequately analyze the indirect and growth-inducing impacts of the project. Appellants also dispute the trial court's conclusions that the analysis of the project's impacts on noise, traffic, air quality and greenhouse gas emissions is inadequate. Preliminarily, appellants also contend the trial court erred in concluding that the Attorney General, who intervened in the petition filed by the City of Long Beach, was entitled to assert objections to the sufficiency of the FEIR that were not raised by any party in the administrative proceedings.

We conclude that the exhaustion requirement that generally apply to parties contesting the adequacy of an environmental impact report do not apply to the Attorney General and that the FEIR fails to adequately consider air quality impacts of the project, particularly impacts to ambient air pollutant concentrations and cumulative impacts of such pollutant concentrations. With respect to all other claimed deficiencies, we conclude that the analysis in the FEIR satisfies the requirements of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[4]

---

Committee, Mothers of East Los Angeles, NAACP Wilmington-San Pedro, the Regents of the University of California, the Los Angeles Coalition for the Economy and Jobs, and the Association of American Railroads in support of appellants.

[4] All statutory references are to the Public Resources Code unless otherwise noted. The administrative regulations adopted to implement CEQA, codified in title 14, section 15000 et seq. of the California Code of Regulations, are referred to as CEQA Guidelines. In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564, fn. 3.)

## Factual and Procedural History

Together, the Ports of Long Beach and Los Angeles (collectively ports) handle up to 64 percent of all oceanic shipping on the West Coast and about 35 percent of such shipping in the United States. As described in the FEIR, "The majority of goods coming into the ports arrive in shipping containers transported on container ships. Once the containers have been off-loaded from ships onto a marine terminal, they are sorted based on destination and transported out of the terminal by truck or train. Containers may be placed on trains inside the terminal (on-dock rail), they may be loaded onto truck chassis (trailers designed to hold containers) to be hauled to their final destination, or they may be loaded onto truck chassis to be drayed to a railyard outside the terminal (near-dock or off-dock rail)."

As of 2008, there were nine operating "on-dock railyards" at the ports. "Typically, trains built on-dock consist of railcars all bound for the same destination, although exceptions do occur. Most cargo that cannot fill a single-destination train on-dock is drayed to an off-dock or near-dock railyard to be combined with cargo from other marine terminals headed for the same destination because those railyard facilities can provide space to hold containers from multiple terminals and assemble them into blocks for common destinations." "Containers handled at the on-dock railyards leave the port area via the Alameda Corridor, a 20-mile long, multiple-track rail system with no at-grade (i.e. street level) crossings that links the rail facilities of the ports with the transcontinental rail network . . . near downtown Los Angeles."

Union Pacific operates the only "near-dock railyard" presently servicing the ports. Union Pacific's near-dock facility is approximately five miles north of the ports. Containers from the ports are transported to the near-dock railyard via trucks on local roads. Trains departing the near-dock railyard utilize the "Alameda Corridor" to connect with the transcontinental rail network.

Currently, there are two "off-dock railyards" that handle the majority of containers from the ports: BNSF's Hobart yard and Union Pacific's East Los Angeles yard. Both railyards are located near downtown Los Angeles, approximately 24 miles north of the

3

ports. Containers are transported by truck, generally via the I-710 freeway, from the ports to the off-dock railyards.

In September 2005, the harbor department released a notice of preparation and initial study for BNSF's proposal to construct a 153-acre near-dock railyard approximately four miles from the ports. The proposed project is referred to as the Southern California International Gateway Project or "SCIG." On October 31, 2005, a supplemental notice of preparation was issued.

Nearly six years later, in September 2011, the harbor department released a draft environmental impact report (DEIR) for the project. Based on comments received during the public comment period, the harbor department revised major portions of the DEIR and on September 27, 2012, the harbor department released a recirculated DEIR (RDEIR) for a 45-day public review period.

On February 22, 2013, the harbor department issued the FEIR. The FEIR describes the proposed project as consisting of "the construction and operation of a new near-dock intermodal rail facility by BNSF that would handle containerized cargo transported through the ports."[5] The project would have the capacity to handle an estimated 1.5 million intermodal containers per year at full operation and would generate approximately 2 million truck trips between the facility and port terminals per year.[6] "The primary objective and fundamental purpose of the proposed project is to provide an additional near-dock intermodal rail facility serving the San Pedro Bay Port marine

---

[5] Cargo that comes through the ports is referred to as either "intermodal" or "transloaded." Shipment of intermodal cargo is made under a single ocean carrier bill of lading. The cargo is transferred in an intact shipping container directly from the port to the railyard. Transloaded cargo has been transferred from 40-foot shipping containers to 53-foot domestic containers at a warehouse before arriving at the railyard.

[6] The FEIR uses different measures to quantify cargo capacity at the railyards. Twenty-foot equivalent units (TEUs) are used to measure container volume handled at individual railyards. Capacity is also quantified in terms of projected "lifts," referring to "the movement of a container from a truck to a train or vice versa." At full operation, the project would have the capacity to handle a maximum of 2.8 million TEUs, or 1.5 million lifts.

terminals that would meet current and anticipated containerized cargo demands, provide shippers with comparable intermodal options, incorporate advanced environmental controls, and help convert existing and future truck transport into rail transport, thereby providing air quality and transportation benefits." The FEIR explains, "The need for additional rail facilities to support current and expected cargo volumes, particularly intermodal container cargo was identified in several recent studies. As discussed in those studies, even after maximizing the potential on-dock rail yards, the demand for intermodal rail service creates a shortfall in railyard capacity. Those studies specifically identified a need for additional near-dock intermodal capacity to complement and supplement existing, planned, and potential on-dock facilities."

At present, BNSF processes intermodal, transloaded and domestic cargo at the Hobart yard. The FEIR indicates that upon completion of the new railyard, BNSF intends to transfer 95 percent of its intermodal business at Hobart to SCIG. "The proposed project would eliminate a portion . . . of existing and future intermodal truck trips between the ports and [Hobart] . . . by diverting them to the proposed SCIG facility." Stated differently, the estimated 2 million truck trips between the port and the proposed new railyard "would replace truck trips that would otherwise go to the [Hobart] yard in East Los Angeles, a journey of 24 miles each way."

BNSF's domestic and transloaded cargo business will remain at the Hobart yard. The FEIR does not analyze the level of activity that will remain at Hobart upon construction of the new railyard or the impact of additional traffic that may then be handled at Hobart. The document explains, "Whether or not SCIG is built, domestic traffic (i.e., traffic from non-Port sources) and transloaded cargos to Hobart will likely continue to grow at a rate related to market demand in the United States economy. . . . Because that growth is not dependent on SCIG being built, it is not appropriate to evaluate that growth as part of SCIG, or any truck trips not going to SCIG."

The FEIR concludes that the project would have significant unavoidable environmental impacts on, among other things, air quality, noise, greenhouse gas emissions and traffic.

On March 7, 2013, the board of harbor commissioners certified the FEIR, adopted a statement of overriding considerations, and approved the project. The resolution was appealed to the Los Angeles City Council which, on May 8, 2013, affirmed the certification and approval.

In June 2013, seven petitions for writs of mandate were filed in the Los Angeles County Superior Court, challenging the certification and approval. The petitions were consolidated for all purposes and later transferred to the Contra Costa County Superior Court. In May 2014, pursuant to a stipulation, the Attorney General intervened in the action filed by the City of Long Beach.

On March 30, 2016, the trial court issued its opinion and order on the consolidated petitions. The court found the FEIR's project description and analysis of indirect impacts and growth-inducing impacts to be deficient because they fail to discuss the reasonably foreseeable indirect impacts from freeing capacity at the existing Hobart yard. The court also held that the FEIR's analysis of noise, traffic, air quality, greenhouse gases and cumulative environmental impacts and of mitigation measures are inadequate. Thereafter, the court issued a peremptory writ of mandate directing the City of Los Angeles to set aside its certification of the FEIR and approval of the project and to comply with CEQA.

The City of Los Angeles and BNSF timely filed notices of appeal in the consolidated proceedings.

**Discussion**

1. *Standard of Review*

"In reviewing compliance with CEQA, we review the agency's action, not the trial court's decision. [Citation.] In doing so, our 'inquiry "shall extend only to whether there was a prejudicial abuse of discretion." [Citation.]' [Citation.] Abuse of discretion is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citation.] Substantial evidence in this context means 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a

6

conclusion, even though other conclusions might also be reached.' " (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 80.)

2. *Exhaustion of Administrative Remedies*

" 'Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action.' [Citation.] Subdivision (a) of CEQA section 21177 sets forth the exhaustion requirement here. That requirement is satisfied if 'the alleged grounds for noncompliance with [CEQA] were presented . . . by any person during the public comment period provided by [CEQA] or prior to the close of the public hearing on the project before the issuance of the notice of determination.' " (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 791-792, fn. & italics omitted.) " 'The rationale for exhaustion is that the agency " 'is entitled to learn the contentions of interested parties before litigation is instituted. If [plaintiffs] have previously sought administrative relief . . . the [agency] will have had its opportunity to act and to render litigation unnecessary, if it had chosen to do so.' " [Citation.]' [Citations.] [¶] To advance the exhaustion doctrine's purpose '[t]he "exact issue" must have been presented to the administrative agency. . . .' [Citation.] While ' "less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding" . . . 'generalized environmental comments at public hearings,' 'relatively . . . bland and general references to environmental matters' [citation], or 'isolated and unelaborated comment[s]' [citation] will not suffice. The same is true for ' "[g]eneral objections to project approval. . . ." [Citations.]' [Citation.] ' "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them." ' " (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535-536.) "An appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies." (*Id*. at p. 536.)

Appellants contend the court lacked jurisdiction to consider certain objections to the sufficiency of the FEIR asserted by the Attorney General because those objections

7

were not made by any party in the administrative proceedings.[7] The Attorney General argues that he is exempt from the exhaustion requirement under section 21177, subdivision (d).[8] (*Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 433 [Under section 21177, subdivision (d), "the Attorney General of California need not comply with the exhaustion of administrative remedies requirement."].) Appellants argue that the exemption in subdivision (d) applies only to identity exhaustion under subdivision (b) and not to issue exhaustion under subdivision (a); that is, that the Attorney General may assert objections that were raised by someone during the administrative proceedings, even if not by the Attorney General, but may not assert objections that no party raised during those proceedings. Excusing the Attorney General from the issue exhaustion requirement does create the possibility that an environmental impact report may be held inadequate for a deficiency that was never brought to the agency's attention and which the agency had no opportunity to correct. Nevertheless, we agree with the Attorney General and the court in *Maintain Our Desert Environment v. Town of Apple Valley*, *supra*, 124 Cal.App.4th 430 that the plain language

---

[7] Appellants assert that the following contentions were not presented in the administrative proceedings: (1) The FEIR failed to analyze single-event maximum noise impacts using the $L_{max}$ noise metric as required by the City of Long Beach's noise ordinance; (2) The FEIR's density calculations misstate the number of trucks that will utilize San Gabriel Avenue; and (3) The FEIR does not explain whether the non-cancer hazard index levels refer to the combined hazard indices for the project and other past, present, and reasonably foreseeable future projects.

[8] Section 21177 provides in relevant part: "(a) An action or proceeding shall not be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination. [¶] (b) A person shall not maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the project before the filing of notice of determination pursuant to Sections 21108 and 21152. [¶] . . . [¶] (d) This section does not apply to the Attorney General."

of section 21177, subdivision (d), exempts the Attorney General from all statutory exhaustion requirements.

Contrary to appellants' argument, the legislative history does not create any ambiguity in the statutory language, let alone establish with certainty that the Legislature intended subdivision (d) to exempt the Attorney General only from identity exhaustion under subdivision (b).[9] To the contrary, the unqualified exemption is consistent with other statutory provisions that recognize the Attorney General's unique authority to protect the environment of the State of California. (See Gov. Code, § 12600, subd. (b) ["It is in the public interest to provide the people of the State of California through the Attorney General with adequate remedy to protect the natural resources of the State of California from pollution, impairment, or destruction."]; Gov. Code, § 12606 ["The Attorney General shall be permitted to intervene in any judicial or administrative proceeding in which facts are alleged concerning pollution or adverse environmental effects which could affect the public generally."]; § 21167.7 [requiring every person who files an action challenging the decision of a public agency on the grounds of noncompliance with CEQA to provide copies of their pleadings to the Attorney General and precluding the granting of any relief until such copies have been furnished.].

---

[9] Appellants cite two pieces of legislative history: (1) a report prepared for the Assembly Committee on Natural Resources by the State Bar Committee on the Environment of the State Bar of California [Com. on the Environment of the State Bar of Cal., Rep. to Assem. Com. on Nat. Resources, The California Environmental Quality Act: Recommendations for Legislative and Administrative Change, Dec. 1983] and (2) an Assembly Committee analysis of the legislation that enacted section 21177 [Cal. Natural Resources Agency, Bill Analysis of Assem. Bill No. 2583 (1983-1984 Reg. Sess.) as amended March 22, 1984]. The Bar committee report at pages 93-95 merely acknowledges the common law exception to identity exhaustion and urges that the exception be codified. The bill analysis at pages 1 and 9 similarly indicates that a purpose of the statutory amendment is to "limit standing to those individual[s] who have participated in the public review process" but notes that this identity exhaustion requirement would not apply to the Attorney General. Both reports are silent with respect to issue exhaustion. Appellants' request for judicial notice of these documents as well as the Senate Committee on Governmental Organization, Staff Analysis of Assembly Bill No. 2583 (1983-1984 Reg. Sess.) as amended June 20, 1984, is granted.

### 3. *Project Description*

"Under CEQA, a 'project' means '*the whole of an action*, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment. . . .' [Citations.] It refers to the underlying 'activity' for which approval is being sought. [Citation.] The entirety of the project must be described, and not some smaller portion of it. [Citation.] The Guidelines specify that every EIR must set forth a project description that is sufficient to allow an adequate evaluation and review of the environmental impact." (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 654.)

"[A] project description that gives conflicting signals to decision makers and the public about the nature and scope of the project is fundamentally inadequate and misleading. [Citation.] 'Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal (i.e., the 'no project' alternative), and weigh other alternatives in the balance.' " (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1052.)

The trial court found that the project description is deficient because it fails to include "a discussion of the reasonably foreseeable indirect changes at Hobart." Appellants contend the court's holding is based on a misunderstanding of what must be included in a project description and confuses the project's description with the analysis of the project's environmental impacts. (See *El Dorado County Taxpayers for Quality Growth v. County of El Dorado* (2004) 122 Cal.App.4th 1591, 1598 ["[A] project description *describes* the project; it does not *analyze* the project's environmental impacts."].) As appellants state, "the activity subject to governmental approval is 'the construction and operation of a new near-dock intermodal rail facility by BNSF that would handle containerized cargo transported through the ports of Los Angeles and Long Beach . . . .' *That* activity 'require[d] discretionary approval from [the harbor department] and, therefore, it is subject to the requirements of CEQA.' "

10

The project description here accurately describes the pertinent features of the construction and operation of SCIG. With respect to the project's cargo handling capacity, the FEIR "takes a conservative approach: it analyzes the capacity the project applicant (BNSF) has applied for (a maximum of 2.8 million TEUs, or 1.5 million lifts at full operation), and assumes that market factors would determine the actual demand that it serves." Respondents argue that the description of the project is misleading and inaccurate because it "defines the project as replacing—rather than increasing—existing BNSF capacity." They argue that "[r]ather than accurately characterizing the project as increasing BNSF's cargo-handling capacity by an *additional* 1.5 million cargo containers per year, the EIR states that SCIG will 'replace' or 'eliminate' operations from BNSF's Hobart yard." They suggest that by defining the project "not as creating *additional* capacity to handle *increased* cargo volumes, but as 'eliminating' existing activities at Hobart," the EIR "profoundly skews the environmental analysis."

Respondents improperly characterize the project description. The FEIR accurately states that the project will permit BNSF to divert a portion of its operations from Hobart to SCIG and also acknowledges that the volume of cargo serviced at Hobart will continue to grow. Neither the project description nor any part of the FEIR suggests that BNSF's total capacity will remain unchanged as a result of the project. There is nothing misleading or inaccurate about the project description. (See *El Dorado County Taxpayers for Quality Growth v. County of El Dorado, supra,* 122 Cal.App.4th at pp. 1597-1598.)

*San Joaquin Raptor Rescue Center v. County of Merced, supra*, 149 Cal.App.4th 645, cited by respondents, is distinguishable. That case involved an environmental impact report in connection with the issuance of a conditional use permit for the proposed expansion of an aggregate mining operation. The EIR described the project as an expansion that includes the mining of additional acreage "*but is not proposed to substantially increase daily or annual production*." (*Id.* at p. 650.) However, the court found that "despite assurances to the contrary, the Project includes a substantial increase in mine production. [¶] . . . By giving such conflicting signals to decision makers and the public about the nature and scope of the activity being proposed, the Project description

11

was fundamentally inadequate and misleading." (*Id*. at pp. 655-656.) The "curtailed and inadequate characterizations of the Project were enough to mislead the public and thwart the EIR process." (*Id*. at p. 656.) "The public hearings reflect similar confusion about the level of production allowed under the Project." (*Id*. at p. 657.) As explained above, neither the project description nor any portion of the FEIR in this case indicates that BNSF's overall capacity will not be significantly increased as a result of the construction of the new railyard. The FEIR is required to evaluate any indirect environmental impact that may be caused by the project arising from increased availability of capacity at Hobart, but there is no deficiency in the manner in which the FEIR describes the SCIG project.

4. *Indirect Impacts on the Hobart Yard*

"In evaluating the significance of the environmental effect of a project, the lead agency shall consider . . . reasonably foreseeable indirect physical changes in the environment which may be caused by the project." (CEQA Guidelines, § 15064, subd. (d).) "An indirect physical change in the environment is a physical change in the environment which is not immediately related to the project, but which is caused indirectly by the project. . . ." (CEQA Guidelines, § 15064, subd. (d)(2).) "An indirect physical change is to be considered only if that change is a reasonably foreseeable impact which may be caused by the project. A change which is speculative or unlikely to occur is not reasonably foreseeable." (CEQA Guidelines, § 15064, subd. (d)(3).) Indirect impacts "may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density, or growth rate, and related effects on air and water and other natural systems, including ecosystems." (CEQA Guidelines, § 15358, subd. (a)(2).)

The trial court found that the FEIR's analysis of indirect impacts is deficient because it omits any discussion of the reasonably foreseeable impacts that will be caused by freeing capacity at the Hobart yard. The court observed that by constructing SCIG, BNSF will "nearly double" its capacity and the FEIR fails to analyze how "BNSF is going to utilize Hobart once additional capacity is created."

Master Response 3 of the FEIR was issued in response to the large number of comments raising concerns about the project's indirect impacts at the Hobart yard. The response provides in relevant part, "A number of commenters have criticized the RDEIR for not evaluating regional changes in goods movement that they posit might occur with implementation of SCIG. Their reasoning is that if SCIG absorbs the international cargo currently going to Hobart, then domestic and transload cargo will backfill the freed-up capacity . . . . Other commenters have criticized the RDEIR for not including future operations at Hobart (i.e., truck and train trips) in the analyses. These assertions are speculative, and not supported by facts or evidence. [¶] In fact, . . . the suggestion that cargo would materialize to backfill the freed-up capacity [is] wholly unsupported by the facts."

The record reflects that at present there is no unmet demand for rail service at the Hobart yard that will give rise to additional traffic when intermodal traffic is diverted to the new railyard. As BNSF explained in its November 28, 2012 memorandum to the harbor department, "BNSF is not aware of any currently unmet demand for cargo transportation that would be generated as a result of moving direct intermodal international cargo from Hobart to SCIG. All Southern California domestic cargo requiring rail transport is already being transported by rail. There is no latent demand for rail transport that is not being served."

Master Response 3 further explained, "there is no reason to believe that cargo would somehow materialize to fill the freed-up capacity. Hobart and other intermodal facilities already accept all cargo in the region that demands rail transport and are not yet operating at capacity, meaning that there is no unserved cargo that would appear to fill freed-up capacity. This conclusion is reinforced by the results of analyses showing that existing railyards, while busy, are not operating at their maximum practicable capacity (MPC); for example, Hobart's current MPC is approximately 1.7 million lifts, whereas, as described above and in Appendix G4, in 2010 it handled only about one million lifts, approximately one-half of them direct international containers. BNSF has already expanded Hobart, but cargo volumes, rather than suddenly increasing, actually decreased

13

between 2007, when the expansion was completed, and 2010 (BNSF, 2012a; BNSF, 2012b). Those volumes were driven by regional and national economic factors (i.e., the 2008 recession), not by the availability of capacity at Hobart."

Domestic and transload cargo volumes are anticipated to increase in the future, but the freed-up capacity at Hobart will not give rise to indirect environmental impacts for at least two reasons. First, as shown by table 2.2 in the FEIR, cited in the master response, "domestic and transload cargo volumes would increase whether or not SCIG is built, and . . . the increases would be the same under either scenario. This is true because demand is independent of capacity—the region's economy would grow at a rate unrelated to capacity at Hobart. . . . [¶] Hobart will continue to accept transload and domestic cargo with or without SCIG." The Intermodal Rail Analysis, prepared by the harbor department, appendix G4 of the FEIR, explains, "The market demand for pure domestic cargo and transload cargo is independent of a project's capacity. In the case of the SCIG project, the region's economy drives the demand for domestic and transload cargo which would grow at a rate unrelated to capacity at Hobart. A facility's capacity does not create growth in demand."

Second, substantial evidence supports the finding that BNSF has capacity at Hobart to meet all projected growth until at least 2035.[10] Contrary to the finding of the trial court, substantial evidence supports the growth predictions used in FEIR. The FEIR predicts that by 2030 the ports will be processing 34.6 million TEUs annually. This prediction is based on a long-term forecast prepared by the Global Insight and Tioga Group in 2009. The "IHS Global Insight/Tioga" forecast is "a demand-based (i.e., unconstrained) forecast, that assumed transportation and infrastructure capacity would be available to meet the demand." The trial court acknowledged the "considerable studies done by and for the Port about the amount of [intermodal] business that will be generated by the world economy over various periods of time."

---

[10] Appellants suggest this date is actually 2046 because the ports are expected to reach capacity in 2035 and thus no further growth is projected thereafter.

14

The FEIR assumes that domestic cargo volumes will "continue to grow at a rate of 2% per year with or without SCIG being built."[11] As the trial court noted, other studies also utilize an estimated growth in domestic cargo of 2 to 3 percent annually. The 2 percent annual growth figure appears to be based on a "IHS Global Insight database" known as "TRANSEARCH" that "shows projections of cargo tonnage for domestic and international goods movement through 2040." According to this database, the domestic cargo sector in the applicable region is projected to grow at rates between 2.1 percent and 3 percent annually from 2012 to 2035. Contrary to respondents' arguments, these growth rates are not unsupported assumptions. They are reasoned predictions by experts on which the city is entitled to rely. (*Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1467.)

As the FEIR explains, "BNSF has already undertaken physical modifications and operational changes that have expanded the capacity of the Hobart Yard. To accommodate future increased cargo volumes at Hobart, BNSF would undertake additional operational and physical changes. . . . BNSF would implement additional physical changes to the Hobart and Commerce facilities that would increase their capacity; BNSF represents that those changes could be implemented without discretionary permits. . . .[12] The operational changes and the approved expansions would allow Hobart/Commerce to handle approximately 3 million lifts . . . per year by 2035, which is approximately 1 million lifts more than its existing capacity. The Port

---

[11] Table 2.2, which contains the predicted growth data shows the domestic cargo business growing by 66 percent between 2010 and 2035 (an average rate of 2.64 percent per year).

[12] In response to comments, the FEIR elaborates: "Further facility developments, technological and operational changes could be made to accommodate the demand projected in the 2009 Cargo Forecast. For example, BNSF could construct additional tracks. 250 wheeled parking spaces could be constructed on property currently owned by or otherwise available to BNSF. With respect to future operational changes, additional switching support, increased stacking, additional cargo handling equipment and manpower would enhance the strip track and parking turn times, thereby further increasing capacity. All of the foregoing may be implemented without discretionary permitting."

independently undertook engineering analyses of the Hobart/Commerce Yard that confirmed BNSF's representations of the potential to expand capacity at these facilities."

In the with-SCIG (proposed project) scenario, BNSF would not have to make changes to its Hobart operations other than to add capacity at some point in the future when demand exceeds capacity (projected by independent analysts to occur as soon as 2023). Since BNSF already has the right to expand its Hobart facilities, the freeing of capacity at Hobart by transferring intermodal traffic to the new railyard may at most *delay* the point at which BNSF elects to expand the Hobart facilities. The expansion will not be the consequence of constructing the new railyard.

Because there is a sufficient evidentiary basis for the city's conclusion that a predicted amount of economic growth will occur with or without this project and that the project is not necessary to enable BNSF to service the projected growth at Hobart, any such growth is not an indirect impact of the SCIG project that the FEIR was required to study.

5. *Growth Inducing Impacts*[*]

Section 21100, subdivision (b)(5), requires that an EIR analyze any "growth-inducing impact[s] of the proposed project" including the ways in which the proposed project could foster economic growth, either directly or indirectly, in the surrounding environment. (CEQA Guidelines, § 15126.2, subd. (d).) Chapter 8 of the FEIR analyzes the growth-inducing impacts of the project.

The trial court found that with the exception of the potential growth-inducing impacts at the Hobart yard discussed above, respondents failed to "make clear what growth in the surrounding environment is omitted from the EIR." The court acknowledged their argument that "the potential for additional cargo handling capacity" could foster economic growth but concluded that the "great majority" of references in the FEIR suggest that "an expanded Hobart" could accommodate predicted growth in intermodal container cargo. The court added that despite respondents written arguments,

---

[*] Part 5 is not certified for publication. (See fn., *ante*, p. 1.)

16

"at oral argument, the issue of 'growth-inducing impacts' was largely subsumed in the argument over Hobart." Ultimately, the court concluded, "Petitioners make no serious argument about any other growth inducing effect. Of course, they bear the burden of proving that the EIR has omitted some matter. Thus, the court gives no further consideration to any effect other than at Hobart."

On appeal, respondents argue the FEIR omits meaningful consideration of how the increase in BNSF's cargo-handling capacity will induce growth at the ports. Appellants contend correctly that this argument in not cognizable because respondents did not file a cross-appeal. "As a general matter, ' "a respondent who has not appealed from the judgment may not urge error on appeal." ' [Citation.] 'To obtain affirmative relief by way of appeal, respondents must themselves file a notice of appeal and become cross-appellants.' " (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 585 [Project opponents, who did not cross-appeal, waived contentions that trial court erred in not setting aside a mitigated negative declaration on additional grounds.].)

*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1181 (*Anderson*) is instructive. In that case, the trial court agreed with project opponents that the EIR for a proposed shopping center and gas station failed to adequately evaluate the traffic and air quality impacts of the gas station. The court severed the gas station from the rest of the project and allowed the rest of the project to proceed. (*Id*. at pp. 1177-1178.) On the appeal by the project opponents of the severance order, the project proponents argued the trial court erred in finding the EIR deficient regarding the gas station's traffic and air quality impacts. (*Id*. at p. 1181.) The Court of Appeal "deem[ed] the claim forfeited because [the city] and Wal-Mart have not cross-appealed on this point." (*Id*. at pp. 1181-1182.) Just as in *Anderson*, respondents have forfeited any claim that the trial court erred in rejecting their challenge to the analysis of growth-inducing impacts, other than Hobart.

We note briefly, however, that respondents' argument is without merit in any event. With respect to economic growth-inducing impacts, the FEIR states, "[B]y facilitating the movement of containers through the ports of Los Angeles and Long

17

Beach, the proposed project would directly accommodate future economic growth." The FEIR concludes that "although the proposed project would provide a needed goods movement facility, it would not induce more cargo through the San Pedro Bay ports. The estimated demand for intermodal cargo capacity in the Los Angeles region can be accommodated by existing UP and BNSF intermodal facilities, especially in view of the planned capacity improvements . . . ." As discussed above, the city reasonably relied on expert predictions of the growth of domestic and international cargo and on expert opinions that market not capacity would drive growth. Likewise, as discussed above, substantial evidence supports the conclusion in the FEIR that BNSF has sufficient capacity at Hobart, with anticipated expansion, to accommodate projected growth. Accordingly, there was no deficiency in the FEIR's analysis of growth-inducing impacts.[13]

6. *Sheila Commerce Mechanical Repair Facility (Sheila yard)*[*]

The Sheila yard is a locomotive mechanical shop that primarily supports operations at the Hobart yard. As with Hobart, the FEIR concludes that no additional analysis of indirect impacts at Sheila yard is required because "[t]he locomotives that would haul trains to and from the SCIG facility would not be additional locomotives, but rather they would be existing and future locomotives that would haul international cargo trains with or without the project." The trial court recognized that "to some extent this issue follows directly from the Hobart issue." The court explained, "The court has found the EIR deficient for its failure to evaluate Hobart. If the Port chooses to supplement the EIR with an evaluation of Hobart, then it must consider whether its conclusions with respect to Hobart lead to the conclusion that additional work will be done at Sheila which

[13] Likewise, we summarily reverse the trial court's related finding that the FEIR is deficient because it does not address Hobart yard in the cumulative impacts chapter. In light of our conclusion regarding the FEIR's treatment of the Hobart facility, we need not consider BNSF's alternative argument that the ICC Termination Act (49 U.S.C. § 10501(b)) preempts efforts "to use CEQA's judicial review process to delay or prevent construction."

[*] Part 6 is not certified for publication. (See fn., *ante*, p. 1.)

18

may have environmental impacts." Having found no basis to require further analysis of impacts arising from the freed capacity at Hobart, we similarly reject the argument that additional analysis of impacts at Sheila yard is required.

> 7. *Air Quality*

Impact AQ-3 assesses whether the proposed project will result in significant emission of criteria pollutants. In making this analysis, the FEIR measures and models in pounds per day (lbs/d) the mass of pollutants to be emitted by operation of the project. The FEIR includes data tables that present both the unmitigated average daily criteria pollutant emissions from operation of the proposed project in the benchmark years 2016, 2023, 2035, 2046, and 2066 and estimated peak daily unmitigated emissions for the same benchmark years.[14] Applying this data to applicable standards of significance, the FEIR concludes emissions "are below the significance thresholds for [oxides of nitrogen $(NO_x)$[15], particulate matter less than 10 microns in diameter $(PM_{10})$ and particulate matter less than 2.5 microns in diameter $(PM_{2.5})$] for all analysis years. Therefore the unmitigated project would have less than significant impacts." Similar analysis of the no project alternative concludes that emissions under the no project alternative also would not be significant.[16] Moreover, daily emissions of $NO_x$, $PM_{10}$ and $PM_{2.5}$ under the project would be consistently lower than under the no project alternative in each of the benchmark years.[17]

---

[14] The benchmark years were selected to "correspond[] to the opening year (2016), the full facility throughput year (2035), and the lease termination year (2066)."

[15] "$NO_x$ is a generic term for the total concentration of mono-nitrogen oxides, nitric oxide (NO) and nitrogen dioxide $(NO_2)$." As the trial court noted, "the EIR used a conversion rate to translate $NO_x$ concentrations to $NO_2$ concentrations."

[16] The no project alternative assumed that "[b]usinesses currently occupying the project site would continue to utilize their existing facilities, and the activities of these businesses would be expected to grow by 10 percent from baseline levels by 2016, after which no further growth is assumed."

[17] The sole exception appears to be in project year 2035 in which the peak daily operations emissions of $NO_x$ from the project will exceed emissions under the no project alternative by 22 pounds a day.

Impact AQ-4 assesses whether project operations will result in significant "offsite ambient air pollutant concentrations" in the geographic area surrounding the project site. Under this analysis, the FEIR measures and models the concentration of pollutants in micrograms per cubic meter ($\mu g/m^3$) that would occur at different geographic locations within the designated area as a result of operations at SCIG. The FEIR used "[d]ispersion modeling of onsite and offsite project operational emissions . . . to assess the impact of the project on local offsite air concentrations." The air dispersion model used was "designed for use with emission sources situated in terrain where ground elevations can exceed the stack heights of the emission sources. The . . . model requires hourly meteorological data consisting of wind direction, wind speed, temperature, stability class, and mixing height. The . . . model allows input of multiple sources and source groupings, eliminating the need for multiple model runs." "[R]ather than modeling each analysis year to identify the maximum pollutant concentrations, a single composite emissions scenario was modeled as a conservative approach. The composite emissions scenario is a combination of the peak year (for the annual $NO_2$ and $PM_{10}$ concentration thresholds), peak day (for the 24-hour . . . $PM_{10}$, and $PM_{2.5}$ concentration thresholds), or peak hour (for the 1-hour $NO_2$ . . .) emissions within the modeling domain by source category. Note that the peak year or day emissions for a particular source category may not necessarily occur in the same year or day as the other categories." The FEIR states that this methodology, characterized by appellants and the trial court as a "worst case" analysis, "results in conservative predictions of concentrations from project operational emissions."

Applying this methodology, the FEIR concludes that project operations will have a significant impact on air quality because ambient air pollutant concentrations "would exceed the SCAQMD [South Coast Air Quality Management District] thresholds for 1-hour and annual $NO_2$, 24-hour and annual $PM_{10}$, and 24-hour $PM_{2.5}$."The FEIR also concludes that the no project alternative will result in similar significant impacts. Specifically, "The No Project Alternative would exceed the SCAQMD thresholds for 1-

hour and annual $NO_2$ and 24-hour and annual $PM_{10}$." Ground-level concentration of $PM_{2.5}$ is not projected to exceed standards of significance under the no project alternative.

Although the FEIR does not contain a table comparing the results of the modeling for the project and no project alternative, comparing table 3.2-28 (maximum offsite $NO_2$ concentrations associated with operations of the project) and table 5.7 (maximum offsite $NO_2$ concentrations associated with operations of the no project alternative) shows that the total ground level concentration of $NO_2$ under the no project alternative will exceed that of the project. But the opposite is true for the concentration of particulate matters. A comparison of table 3.2-29 (maximum offsite $PM_{10}$ and $PM_{2.5}$ concentrations associated with operation of the project) with table 5.8 (maximum offsite $PM_{10}$ and $PM_{2.5}$ concentrations associated with operation of the no project alternative) shows that over a 24-hour period ground level concentration of $PM_{10}$ for project operations will be more than three times greater than the concentration under the no project alternative (9.1 μg/m3 to 2.9 μg/m3) and that ground level concentration of $PM_{2.5}$ for project operations will be five times greater than the concentration under the no project alternative (4.5 μg/m3 to 0.9 μg/m3).

Figures included in section 3.2 and appendix C2 of the FEIR show the geographic areas in which the ground-level concentration of various particulates are projected to exceed standards of significance. While the geographic area impacted by significant concentration of $NO_2$ remains the same, the area impacted by significant annual and 24-hour concentrations of $PM_{10}$ varies considerably. The significant concentration of $PM_{10}$ under the no project alternative occurs just to the east of Interstate 710, while the significant concentration of $PM_{10}$ under the project is centered over and adjacent to the project site. Figure 3.2-9 shows that the impact of significant ground-level concentration of $PM_{2.5}$ is restricted to small areas directly over the project site.

The trial court found that the composite emissions scenario is misleading and provides insufficient information to permit meaningful comparison of the project and the no project alternative. The court explained, "Had the screening analysis shown that there would never be an exceedance of a concentration standard of significance the analysis

21

could have ended there. [¶] But that is not what the screening analysis showed. . . . [¶] . . . [¶] Having screened—and having found potential exceedances from SCIG—the EIR stopped its analysis. It left the public and decision-makers in the dark about whether there would be exceedances of $NO_2$, $PM_{2.5}$ and $PM_{10}$ standards in any given year at a given place. By combining concentrations from different years (for screening purposes) the EIR never examined the impact of SCIG in any given year. It showed that there could be an impact, but it did not examine what that impact might be, who might be affected, and for how long." The trial court emphasized that this "is not a small point. The SCIG has been presented as a project that will improve air quality significantly. . . . Those commenting on the EIR, as it was being developed, expressed considerable concern about the impact of air pollution on those who live near the proposed project."

Appellants argue that the composite emissions scenario methodology is a "common industry-accepted protocol" that is amply supported by substantial evidence, including expert opinion. They argue that contrary to the court's conclusion, this methodology is not misleading nor did it result in the omission of any necessary information from the FEIR.

As appellants' argue, the FEIR analysis was conducted in accordance with the harbor department's protocol for criteria pollutant dispersion modeling. The "Methodology for Criteria Pollutant Dispersion Modeling in Port of Los Angeles CEQA Documents" cited by appellants recommends using "screening-level dispersion modeling with conservative emissions" to screen out pollutants followed by modeling of maximum pollutant concentrations each project analysis year. The protocol recognizes, however, that for "large CEQA projects . . . it is often not practical to perform criteria pollutant dispersion modeling separately for each project analysis year because of the sheer number of model runs (pollutants × averaging periods × alternatives × mitigated & unmitigated × coarse & fine grids). To further complicate matters, the spatial and physical diversity of the source types often make it impossible to determine which analysis year would yield maximum concentrations. For example, cargo handling equipment emissions often peak in the early years of a project, while ocean-going vessel

22

(OGV) emissions often peak in the latter years; the concentrations associated with combined emissions could peak in either year or sometime in between. [¶] As a conservative solution, the air quality analyst may choose to limit the number of modeling runs by modeling a single composite emissions scenario for each combination of pollutant, averaging period, and project alternative. . . . The composite emissions scenario would include the highest emissions by source category over the appropriate range of analysis years. The highest emissions for a particular source category may not necessarily occur in the same year as the other categories. For example, project emissions could be grouped into the following source categories: trucks, cargo handling equipment, OGVs, harbor craft, locomotives, and construction. The maximum emissions over the range of applicable analysis years are determined separately for each source category. These maximum emissions are then modeled together to conservatively predict maximum ground-level criteria pollutant concentrations for the pollutant and averaging period of interest. This screening method would result in conservative (i.e., over-predicted) concentrations from project emissions."

"Under CEQA, an agency is not required to conduct all possible tests or exhaust all research methodologies to evaluate impacts. Simply because an additional test may be helpful does not mean an agency must complete the test to comply with the requirements of CEQA. [Citation.] An agency may exercise its discretion and decline to undertake additional tests." (*Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 524.) It is the objector's burden to establish that the methodology used was misleading or that "relevant, crucial information" was omitted that rendered the analysis legally inadequate. (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus, supra,* 27 Cal.App.4th at pp. 738-739; *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 643.)

While we do not agree that the composite emissions, or worst case, methodology is misleading,[18] we do agree with the trial court that the analysis of air pollution concentration impacts is nonetheless incomplete. "When assessing the legal sufficiency of an EIR, the reviewing court focuses on adequacy, completeness and a good faith effort at full disclosure. [Citation.] 'The EIR must contain facts and analysis, not just the bare conclusions of the agency.' [Citation.] 'An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.] Analysis of environmental effects need not be exhaustive, but will be judged in light of what was reasonably feasible." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390-1391.)

---

[18] The trial court offered the following hypothetical to demonstrate how the methodology could be misleading: "Suppose the following: [¶] • the highest value for the No Project alternative occurs in 2016, while the highest value for the Project occurs in 2035; [¶] • the 2016 No Project value is higher than the 2035 Project value; [¶] • for all years after 2016 the highest value for the No Project alternative is lower than the highest value for the Project. [¶] The composite analysis would have the reader of the EIR believe that the No Project alternative is worse than the Project, because the analysis is characterized by the highest value that ever occurs—even if just once in 50 years. This shows nothing about how the two alternatives compare in any given year. Indeed, it is terribly misleading."

Respondents suggest that the "undisputed facts" in the record support the factual basis for the trial court's hypothetical and demonstrate that the methodology is misleading. However, as set forth above, the air quality modeling shows that the no project's emissions levels would be consistently higher than project emissions in the benchmark years. There is no factual basis for the trial court's hypothetical, which assumes that the impacts of the no project alternative would be consistently lower than those of the project in later years. Respondent's defense of the facts underlying the hypothetical mistakenly considers emissions from only the project site, disregarding projected truck emissions on the I-710 freeway. The trial court's unsupported hypothetical does not show that the analysis of air pollution concentrations is misleading. (See *Save our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 121 [" '[A]n EIR must focus on impacts to the existing environment, not hypothetical situations.' "].)

The trial court concluded that the analysis of air pollution concentrations is inadequate because a reader cannot compare the ambient air pollutant concentrations under the project and no project scenarios at any given point in time. Appellants contend that CEQA imposes no such specific requirement. They argue that the FEIR disclosed that the project would result in significant air quality concentration impacts and thereby adequately informed the public of the project's impacts. They suggest that "an EIR that performs a 'worst- case-scenario' analysis of 'the greatest potential impacts' of a project properly 'promote[s] informed decision making, and evidences a good faith effort at forecasting' the project's impacts, consistent with the goals of CEQA."

We agree with the trial court that crucial information has been omitted from the FEIR. Project neighbors reading the FEIR would learn that for benchmark years, peak and average daily *emissions* of $PM_{10}$ will be lower under the project than under the no project alternative. The composite analysis shows, however, that the *concentration* of $PM_{10}$ in the area immediately surrounding the project will in the worst case be three times greater under the project than under the no project alternative. Moreover, from what can be gleaned from data spread throughout the FEIR but never explicitly analyzed or discussed, the concentration of $PM_{10}$ that currently exists over the lengthy stretch of highway over a mile away from the project site will, under the project, be concentrated in the area immediately surrounding the project, which includes both homes and schools.[19] Thus, it is particularly important to understand, and the FEIR does not disclose or estimate, how frequently and for what length of time the level of particulate air pollution in the area surrounding the proposed rail yard will exceed the standard of significance. The composite analysis does not disclose the frequency of occasions or the estimated length of time during which ambient pollutants will remain at heightened levels—

_____

[19] The City of Los Angeles states in its brief that "Except for 1-hour $NO_2$, the project's significant concentration impacts would be confined to uninhabited or industrial areas close to the project site." Figures 3-2.7 and 3-2.8 (annual and 24-hour $PM_{10}$ ground-level concentration for mitigated project), figure 1-1 (proposed project site location) and figure 3.2-1 (locations of sensitive receptors in the vicinity of the proposed project site) appear to indicate the contrary.

25

whether the worst case will be the situation for only a day or for as long as the railyard is in operation. Will air quality improve over time or remain fairly constant?[20] Without such an understanding, the public and decision-makers cannot fairly consider alternatives or mitigation measures or intelligently balance competing considerations before adopting a statement of overriding considerations. (See CEQA Guidelines, § 15093.)

Appellants' reliance on cases approving "worst-case scenario" analyses in CEQA cases is misplaced. For example, in *Sierra Club v. Tahoe Regional Planning Agency* (E.D.Cal. 2013) 916 F.Supp.2d 1098, 1147, the EIR examined "the noise impacts of the project's construction activity based on the 'worst-case scenario' in which the three loudest pieces of equipment would be operating at the same time." The court concluded that the analysis was sufficient because the analysis was "thorough and carefully detail[ed] the level of noise that will result from the project" at "all times of day." (*Id*. at pp. 1148-1149.) While a project neighbor in that case could predict what noise levels would be at any given time of day under the worst case scenario, the same cannot be said for a project neighbor in the present case. In this case, a neighbor will have no idea how bad air quality will be, if the railyard is constructed, at any point or for how long in the future.

Finally, appellants cite no evidence to support their contention that the inclusion of additional information regarding air pollutant concentrations would be impractical. Citing the protocol quoted above, they argue, "were CEQA to require an EIR to analyze every potential impact for every year of a project's lifespan, or even for a series of benchmark years, agencies would be required to run thousands of complex dispersion models – effectively grinding the CEQA process to a halt." The protocol, however, does not excuse CEQA compliance. It provides general guidelines and requires the air quality analyst to determine whether it is appropriate to "limit the number of modeling runs" and to select the "appropriate range of analysis years." A reasonable selection of benchmark years, as

---

[20] While the comparison of concentrations of $NO_2$ is perhaps more meaningful because both emissions and concentrations are worse under the no project alternative, the analysis is still inadequate to the extent impacts are identified generally without reference to time.

in other analyses, may be acceptable. In this instance, the decision to perform only a single modeling run with a 50-year analysis range does not comply with CEQA.

Accordingly, we agree with the trial court that with respect to impact AQ-4, the harbor department "failed to proceed in the manner required by CEQA, and the [FEIR] fails to set forth sufficient information to foster informed public participation and reasoned decision making."

8. *Mitigation Measure AQ-9: Periodic Review of New Technology and Regulations[*]*

The EIR's ninth mitigation measure for air quality impacts (MM AQ-9) provides in relevant part as follows: "The Port shall require BNSF to review, in terms of feasibility, any Port-identified or other new emissions-reduction technology, and report to the Port. Such technology feasibility reviews shall take place at the time of the Port's consideration of any lease amendment or facility modification for the Project site. If the technology is determined by the Port to be feasible in terms of cost, technical and operational feasibility, BNSF shall work with the Port to implement such technology." The mitigation measure continues, "As partial consideration for the Port agreement to issue the permit to BNSF, BNSF shall implement not less frequently than once every five (5) years following the effective date of the permit, new air quality technological advancements, subject to mutual agreement on operational feasibility and cost sharing, which shall not be unreasonably withheld. The effectiveness of this measure depends on the advancement of new technologies and the outcome of future feasibility or pilot studies." MM AQ-9 was identified in the FEIR as a mitigation measure designed to reduce the impacts of exposure to significant levels of toxic air contaminants (TACs).[21] The FEIR states that construction mitigation measures "would reduce the impacts from the proposed Project by reducing emissions from construction equipment operating at the Port pursuant to LAHD Construction Guidelines. In addition to the construction

---

[*] Part 8 is not certified for publication.  (See fn., *ante*, p. 1.)

[21] TACs are "compounds that are known or suspected to cause short-term (acute) and/or long-term (chronic non-carcinogenic or carcinogenic) adverse health effects."

mitigation measures, other mitigation measures to reduce Project health risk impacts include the use of low-emission drayage trucks and periodic review of new technologies." The harbor department's findings of fact clarifies that the construction mitigation measures and use of low-emission drayage trucks were "quantified and included in the mitigated construction emissions" and as a result, the risks of exposure to TACs are "below the significance threshold for all categories of receptors." Mitigation measure AQ-9 was not quantified but was expected to "contribute to the advancement of [the harbor department's] environmental goals and objectives."

The trial court found MM AQ-9 was not "fully enforceable" as a mitigation measure because it did not seem likely to "actually result" in the implementation of such future feasible technologies at the project site. Appellants dispute the finding that the measure is not enforceable and argue further that "any perceived defect in enforceability was not prejudicial" because the FEIR does not rely on the measure to reduce the impact to a less than significant level.

"When a project will result in an adverse change to the physical environment, CEQA instructs that 'the agency "shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures" [citation] and must adopt a monitoring program to ensure that the mitigation measures are implemented [citation]. The purpose of these requirements is to ensure that feasible mitigation measures will actually be implemented as a condition of development, and not merely adopted and then neglected or disregarded.' " (*California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 189.)

The mitigation measure in dispute anticipates future improvements in technology that are not presently available and perhaps not even contemplated. In light of what is unknown, a more specific measure may be an impossibility. MM A-Q 9 imposes the requirement that BNSF not unreasonably withhold its agreement to the adoption of new technology. While disagreements in the application of this standard are possible, the standard is nonetheless objective and can be enforced. (*Peak-Las Positas Partners v.*

28

*Bollag* (2009) 172 Cal.App.4th 101, 104, 106 [Under contract requiring "mutual consent" which "shall not be unreasonably withheld," reasonableness in withholding consent is determined under an objective rather than subjective standard.]; *County of Amador v. City of Plymouth* (2007) 149 Cal.App.4th 1089, 1111 [Provision in a municipal services agreement, which is subject to CEQA requirements, that the city "will not unreasonably withhold any approvals required to implement the water and sewer provisions" represents a commitment by the city to a definite course of action.].) Under the circumstances we agree with appellants that the measure is reasonable.

9. *Cumulative impacts on Air Quality*

CEQA requires that an EIR discuss the significant cumulative impacts to which a proposed project would contribute, taking into account past, present, and probable future projects causing similar impacts. (CEQA Guidelines, § 15130.) "Cumulative impacts" are defined as "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (CEQA Guidelines, § 15355.) Such impacts are "significant" when a project's incremental effect on other projects' effects is "cumulatively considerable." (CEQA Guidelines, § 15130, subd. (a).)

The FEIR identifies Union Pacific's proposal to modernize and expand its existing Intermodal Container Transfer Facility (ICTF), located adjacent to SCIG's northern boundary, as one of 170 present or reasonably foreseeable future projects that could contribute to cumulative environmental impacts.[22] The FEIR concludes, under

---

[22] The DEIR included additional information about the proposed expansion of the ICTF that was, as discussed below, omitted from the RDEIR and the FEIR. According to the DEIR, the proposed expansion project would increase capacity to handle containers at the ICTF from the current annual average of 725,000 containers to an estimated 1.5 million containers and would increase truck traffic from 1.1 million one-way trips a year to 2.268 million trips per year. Section 4.3 of the DEIR contains a combined analysis of the impacts from the SCIG and ICTF facilities. The DEIR states, "This section provides an analysis of the combined effects of the proposed SCIG Project and the proposed ICTF Modernization and Expansion Project for air quality (emissions, health risk), noise, and traffic. This analysis is not required under CEQA and is provided as additional

cumulative impact AQ-4, that operation of "past, present, and reasonably foreseeable future projects," including the proposed project and the proposed expansion of ICTF, would result in a significant cumulative air quality impact related to exceedances of the significance thresholds for $NO_X$, $PM_{10}$, and $PM_{2.5}$. The FEIR explains that "Although there is no way to be certain if a cumulative exceedance of the thresholds would happen for any pollutant without performing dispersion modeling of the other projects, previous experience indicates that cumulative air quality impacts would be likely to exceed the thresholds for $NO_X$, could exceed the thresholds for $PM_{10}$ and $PM_{2.5}$, and would be unlikely to exceed the thresholds for CO." The FEIR adds that because "operation of the proposed project would cause exceedances of the SCAQMD thresholds for 1-hour and annual $NO_2$, 24-hour and annual $PM_{10}$, and 24-hour $PM_{2.5}$ . . . , the project would result in a cumulatively considerable contribution to a significant cumulative impact." The FEIR also concludes, under cumulative impact AQ-7, that the "past, present, and reasonably foreseeable future projects" and the proposed project do not have a significant cumulative impact on non-cancer risk.

The trial court acknowledged that the "ICTF facility and the ICTF expansion Project are mentioned throughout" the cumulative impacts chapter and that "[i]n many respects, these mentions are brief but sufficient." The court found, however, that the analyses under cumulative impact AQ-4 (ambient air pollutant concentrations) and cumulative impact AQ-7 (noncancer health risks) were inadequate.

---

information only because of the close proximity of the two proposed projects." The combined analysis included data supporting the conclusion that there would be no significant cumulative impact from operational emissions of past, present and reasonably foreseeable future projects. The combined analysis was omitted from the RDEIR and FEIR because the anticipated publication date for the draft EIR for the ICTF project was delayed significantly. As appellants explained in the trial court, "the SCIG project and the ICTF [expansion] project were running essentially neck and neck in their progress for approval" when the draft EIR was prepared but "by the time the RDEIR was prepared, the ICTF had fallen far behind" so the analysts concluded that "the information concerning the [ICTF expansion] project was simply not concrete enough" to merit continued inclusion.

30

With respect to the cumulative impacts analysis under AQ-4, the court explained that the analysis "disclaims an ability to know 'if cumulative exceedances of thresholds would happen for any pollutant without performing dispersion modeling of the other projects' " but concludes that "operations of the past, present and reasonably foreseeable future projects, including the proposed project, would result in a significant cumulative air quality impact." The court observed that the analysis relies on the "seriously deficient" screening methodology discussed above without any discussion of how the expansion at ICTF will affect pollutant concentrations. "This is important, since an increase in air pollution from the ICTF will be emitted 'next-door' to SCIG, and presumably have a significant impact on those living in the vicinity of both facilities."

Appellants contend that CEQA does not require quantification of any air quality impacts of the ICTF because quantification in this instance is impractical and unreasonable. Appellants are likely correct that conducting dispersion modeling for the ICTF expansion project would be unreasonably time consuming and impractical, if not already completed for the applicable project EIR, and that it is within the harbor department's discretion to evaluate whether the original emissions data has become unreliable with the passage of time. Nonetheless, as the trial court observed, the fact that "CEQA does not require quantified analyses[] does not mean that all meaningful information on a subject can be omitted from an EIR's cumulative impacts analysis." We agree with the trial court that the analysis identifies the potential cumulative impacts of the ICTF expansion project "in such general terms that the 'big picture'—two large railyard expansions located next to one [another]—is missing from the analysis" and that "when the combined analysis was removed from the DEIR, so too was the acknowledgment that the ICTF expansion project was not just another land use project in the area." Accordingly, the harbor department must make a "good faith and reasonable disclosure" of the cumulative impacts before the FEIR may be approved.

With respect to cumulative impact AQ-7, the court found that there was no substantial evidence to support the conclusion that "the past, present, and reasonably

31

foreseeable future projects and the proposed project do not have a significant cumulative impact on non-cancer risk." We disagree.

Under cumulative impact AQ-7, the FEIR explains, "Emissions of TACs would increase chronic and acute noncancer effects compared to baseline levels . . ., but the increases would all be well below the 1.0 hazard index significance criterion at all receptors near the project site." Appellants elaborate further: "Table 3.2-35 of the EIR shows various hazard indices for non-cancer health risks, breaking out the portion attributable to baseline conditions ('CEQA 2010 Baseline') and the portion attributable to SCIG ('CEQA 2010 Increment') to reach a total hazard index under the project scenario. The EIR forecasts that maximum non-cancer risks will occur at occupational and recreational receptors, where acute hazard indices under the project scenario measure 0.5 (comprised of a 0.3 baseline and a 0.2 increase attributable to SCIG). . . . [¶] Even assuming the ICTF expansion project were next door to SCIG and had the same incremental impact on non-cancer hazard indices as SCIG (0.2), the maximum hazard index would still be only 0.7—that is, a 0.3 baseline, a 0.2 increase attributable to SCIG, and another 0.2 increase attributable to ICTF expansion. This would still be well below the 1.0 significance threshold." The data in table 3.2-35 amply supports the conclusion reached under cumulative impact AQ-7. [23]

10. *Traffic*[*]

According to the FEIR, all trucks traveling from the port to SCIG will be required to take Highway 103 northbound before heading westbound on Highway 1. San Gabriel

_____

[23] The trial court's contrary finding appears to have been based on a double counting of the baseline. The court explained only that if the acute hazard index for occupational and recreational receptors is 0.5 and "if ICTF has emissions equal to SCIG, it is not unlikely that the hazard index could rise to a level of significance." Moreover, contrary to the trial court, we do not assume that the ICTF was not considered in reaching the conclusion that "past, present and *reasonably foreseeable future projects* and the proposed project do not have a significant cumulative impact on non-cancer risk." Although not expressly referenced by name, the ICTF is clearly identified as a reasonably foreseeable future project for purposes of evaluating cumulative impacts.

[*] Part 10 is not certified for publication. (See fn., *ante*, p. 1.)

Avenue is a short road with one lane in each direction that runs parallel to Highway 103 for about half a mile. The exchange between Highway 103 and Highway 1 requires trucks exiting Highway 103 to merge onto southbound San Gabriel Avenue for a short distance (less than a block) before entering the on-ramp to Highway 1. By 2035, approximately 2,771 trucks a day would follow this route.

The trial court faulted the FEIR for failing to analyze traffic on San Gabriel Avenue, particularly with respect to impacts on residents at the Century Villages at Cabrillo (Villages), a 27-acre supportive housing community located on San Gabriel Avenue just north of the off-ramp from highway 103 and the entrance to Highway 1. Appellants dispute this finding. They argue that although the FIER does not expressly reference San Gabriel Avenue, impacts to the affected segment of San Gabriel Avenue were subsumed within the analysis of the freeway exchange between northbound Highway 103 and westbound Highway 1.

Specifically, table 3.10-9 shows the baseline conditions for the "weaving section" at the junction of northbound Highway 103 and westbound Highway 1. The table indicates the level of service for this section at peak a.m. hours and at peak p.m. hours. Table 3.10-30 shows the "baseline plus proposed project conditions" for the same segment. The level of service remains the same. Appellants explained that the FEIR uses a "weaving" analysis to evaluate this connection because it is a "free-flow (no impediment such as stop sign or yield sign) movement with a merge." As noted by the trial court, the highway capacity model cited by appellants provides substantial evidence for the selection of this methodology in these circumstances.

Initially, respondents contend that there is no substantial evidence in the record to support the density numbers contained in table 3.10-30 that were used to calculate the level of service. Table 3.10-9 shows that the density[24] for the a.m. peak hours is now 9.3

---

[24] The SCIG Transportation Appendix (Appendix G) indicates that density is measured in passenger cars per mile per lane (pc/mi/ln). These tables indicate, however, that density is measured in passenger cars per hour per lane (pc/hr/ln). Appellants suggest the label used in the tables is a harmless typographical error that could easily have been fixed if raised

cars per mile per lane (pc/mi/ln) and the density for p.m. peak hours is 15.7 pc/mi/ln. Table 3.10-30 shows that under the project the density for the a.m. peak hours would drop to 9.2 and the density for p.m. peak hours would rise to 16.8. In the trial court, appellants cited the "weave analysis sheets" in Appendix G and explained that the harbor department's "traffic experts found that the volume added due to the project is 200 [passenger car equivalents or pce] in the p.m. peak hour at that location, which was added to the 175 pce of non-project trips, for a total of 375 pce trips weaving into Pacific Coast Highway [Highway 1] from the northbound Terminal Island Freeway [Highway 103] off ramp. This 375 pce trips with other analysis factors translates into 16.8 density value under a detailed calculation shown in the Highway Capacity Manual 2000." The trial court acknowledged that "there may well be an explanation [for the density numbers] of the sort offered in respondents' brief" but based on its review of Appendix G, the court was unable to "discern any evidence to support" the density numbers found in table 3.10.30. In their reply brief on appeal, appellants concede that the "data, which had been collected and used to calculate the numbers in table 3.10.30, . . . was inadvertently omitted from the EIR's appendices."

As noted above with respect to the exhaustion issue, appellants argue that the omission could have been corrected had a timely objection been made during the administrative proceedings. Assuming appellants are correct that the data exists and supports the numbers reflected in the table, the omission can easily be corrected in the continued administrative proceedings that will otherwise be required.

More fundamentally, respondents contend the FEIR fails to consider how the influx of trucks will impact residents at the Villages. In its comment to the RDEIR, Villages expressed concern that the mixing of heavy truck traffic from the project with traffic to and from the Villages "will cause confusion and dangerous conditions" and will cause "traffic to slow significantly." The city's response states correctly, "While the

during the administrative process. We agree and assume that the correction will be made during the continued administrative proceedings.

34

comment suggests that the proposed project would cause 'confusion and dangerous conditions . . . [and] . . . the mixing of traffic will also cause the truck traffic to slow significantly . . . ,' the comment provides no evidence to support this conclusion." Contrary to the Villages' comment, the traffic modeling reflected in table 3.10-30 suggests that there will be little traffic congestion on San Gabriel Avenue as a result of the project. Moreover, because the project requires trucks to follow the specific route to SCIG from the port, it is possible for residents of the Villages to avoid project trucks entirely. The only time trucks and residents must share the road is when they are both entering the on-ramp to westbound Highway 1. The FEIR reasonably concludes that "there are not many trips anticipated to be on San Gabriel Avenue south that would merge with the SR-103 off-ramp traffic" because San Gabriel Avenue serves only "a small residential area to the north." Although respondents challenge the characterization of the Villages as a "small" residential community, the description is supported by the record. In November 2012, there were 1,830 residents at the Villages, 30 percent of whom were children. Presumably not all of them will be heading onto westbound Highway 1 at the same time. Accordingly, contrary to the trial court's finding, the FEIR sufficiently analyzes traffic on San Gabriel Avenue.

11. *Noise Impacts on the City of Long Beach*[*]

The FEIR analyzed noise impacts from project construction and operation noise on sensitive receptors in the City of Long Beach including single-family residences, educational and religious establishments, industrial properties with potential residential uses, parks and open space and three fire stations. Impact NOI-6 evaluated impacts from construction and operational noise on "noise levels." Under the standard of significance adopted in the FEIR, an impact would be significant "if ambient noise levels would be increased by three dBA [A-weighted decibels] or more; or maximum noise levels allowed

---

[*] Part 11 is not certified for publication.  (See fn., *ante*, p. 1.)

by the Long Beach Municipal Code would be exceeded."[25] Impact NOI-8 analyzed impacts from construction and operational noise on sleep disturbance. Under the standard selected in the FEIR, "A significant impact for sleep disturbance would occur when residences within the immediate vicinity of the Project Site and Project Site components within the City of Long Beach are exposed, at an average frequency of once in 10 days, to interior nighttime SEL [sound exposure level] sufficient to awaken at least 10 percent of their residents assuming windows remain open. The threshold of significance for interior nighttime noise is 80 dBA SEL." Impact NOI-9 analyzed impacts from construction and operational noise on classroom speech interference. Under the standard of significance adopted in the FEIR, "A significant impact for classroom speech interference would occur when schools within the immediate vicinity of the Project Site and Project Site components within the City of Long Beach are exposed to exterior noise levels during school hours sufficient to result in interior noise level of 52 dBA, sufficient for momentary disruption of speech intelligibility in classroom teaching situations (assumed to be at 20 feet)."

The FEIR concludes that "[p]redicted daytime operational noise levels from the proposed Project site would exceed existing measured ambient noise levels by 3 dBA or greater at the residence at 2789 Webster (R1) and at Cabrillo High School (R5). Predicted

---

[25] According to the FEIR, "Chapter 8.80 of the Long Beach Municipal Code controls unnecessary and excessive noise and vibration in the City of Long Beach. Section 8.80.150 of the Long Beach Municipal Code outlines acceptable exterior noise levels by land use that apply to operations noise. As listed in table 3.9-11, daytime noise levels at residential areas are not to exceed 50 dBA. In addition, it is unlawful for any person to create any noise which causes the noise level when measured on residential property to exceed: [¶] [1.] The noise standard for that land use district as shown in Table 3.9-11 for a cumulative period of more than thirty minutes in any hour; [¶] [2.] The noise standard plus five dBA for more than 15 minutes in any hour; [¶] [3.] The noise standard plus ten dBA for a cumulative period of more than five minutes in any hour; [¶] [4.] The noise standard plus 15 dBA for a cumulative period of more than one minute in any hour; or [¶] [5.] The noise standard plus 20 dBA or the maximum measured ambient, for any period of time. [¶] If the measured ambient level exceeds that permissible, the allowable noise exposure standard shall be increased in 5 dBA increments in each category as appropriate to encompass or reflect the ambient noise level."

nighttime operational noise levels would exceed existing ambient noise levels by greater than 3 dB at the residence at 2789 Webster (R1), at the Buddhist Temple (R2), and at the Century Villages at Cabrillo (R7A). These increases represent a significant impact. [¶] Interior noise levels from Project operations would not be expected to exceed municipal code standards for classroom interior spaces. Further, interior operational noise levels would not be expected to approach or exceed existing ambient interior noise levels within active classrooms. Interior construction noise levels would exceed [Long Beach Municipal Code] standards at the Cabrillo Child Development Center (R6) and future noise levels would exceed existing ambient noise levels by greater than 3 dB at the Bethune School (R7); therefore, classroom noise impacts would be significant." With proposed mitigation most of the impacts would be reduced to less than significant but nighttime operational noise levels would remain significant and unavoidable. The FEIR also concludes that the impact of the predicted SCIG train horns on sleep at nearby residences and the impact of on-site and rail corridor operational noise on speech intelligibility in classrooms would both be less than significant.

The trial court concluded that the FEIR is inadequate because it fails to analyze under impact NOI-6 whether "single-event noise" would exceed "maximum noise levels" allowed under the City of Long Beach noise ordinance. The court found no inadequacy in the FEIR's discussion of single-event noise impacts on sleep or speech intelligibility under impacts NOI-8 or NOI-9. Nor did the court find inadequate the analysis of project construction and operations on ambient noise levels under impact NOI-6. Rather, the court concluded that because the Long Beach noise ordinance sets maximum noise levels for both ambient and single-event noise and the FEIR expressly adopted the "maximum noise levels allowed by the Long Beach Municipal Code" as a standard of significance for impact NOI-6, the FEIR was required to analyze single-event noise as well as ambient noise under impact NOI-6.

Appellants contend that NOI-6 was intended to analyze increases in ambient noise levels only, not single-event noise. According to appellants, the harbor department selected different standards of significance, based on SEL levels and maximum noise

37

levels, to evaluate single event noise impacts on sleep (NOI-8) and speech intelligibility (NOI-9). They argue that the trial court disregarded the harbor department's "discretion to select, develop, interpret, and apply its own thresholds of significance based on substantial evidence."

Although the language used in the FEIR is perhaps imprecise, a fair reading supports appellants' argument that impact NOI-6 was intended to evaluate only increases in ambient noise levels.[26] Because the trial court's conclusion was based solely on the premise that NOI-6 was intended to, but did not, analyze single-event noise, we cannot accept its conclusion. Respondents assert no other deficiency in the analysis of noise impacts, so that we conclude this portion of the FEIR complies with CEQA.

12. *Greenhouse Gas Emissions*

Chapter 3.6 contains the FEIR's discussion of greenhouse gas (GHG) emissions. The chapter analyzes two potential impacts. First, under impact GHG-1, the FEIR considers whether the project "would result in an increase in construction-related and operation-related GHG emissions." The FEIR quantifies GHG emissions and concludes that significant impacts would occur under the proposed project because the new railyard "would produce GHG operational emissions that would exceed the CEQA baseline levels when the project reaches its full capacity in 2035 and beyond."

Under impact GHG-2, the FEIR considers whether the proposed project would "conflict with state and local plans and policies adopted for the purpose of reducing GHG emissions." The FEIR concludes that the proposed project "is consistent with state and local policies and plans for GHG emissions and climate change. Accordingly, there are no significant impacts resulting from inconsistencies with existing plans and policies." The FEIR explains, "The proposed project would result in more efficient use of fossil fuels to move goods as a result of increased use of rail versus trucking between the Ports and the SCIG facility. The project is consistent with key legislation, regulations, plans

---

[26] Appellants may well be correct that this ambiguity could have been resolved had a proper objection been raised in the course of the administrative proceedings.

and policies described in section 3.6.3, applicable regulations. [¶] The ratio of locomotive fuel efficiency to truck fuel efficiency on a per-ton-mile basis ranges from 1.9 to 5.5 (Federal Railroad Administration, 2009). Increased fuel efficiency reduces GHG emissions on a per-ton-mile basis. The project, by shifting the drayage truck trips from Hobart yard to the SCIG facility, would increase the fuel efficiency of regional cargo movement and decrease GHG emissions. This fundamental feature of the Project is consistent with the California Air Resources Board's [CARB] scoping plan[27] for reducing GHG emissions from the Goods Movement sector which calls for efficiency-based GHG reductions in activities such as port-related trucks, cargo handling equipment, and freight transport."

In contrast, the FEIR concludes that the no project alternative would conflict with state and local plans and policies adopted for the purpose of reducing the emissions of GHGs. The FEIR explains, "The no project alternative would not increase use of more efficient modes of goods movement by continuing to move cargo by truck to the Hobart yard. Therefore no additional efficiency in cargo movement is realized in the no project alternative, which is inconsistent with the goals of the AB32 scoping plan, the Western

---

[27] In 2006, the Legislature enacted Assembly Bill No. 32 (2005-2006 Reg. Sess.) which directed "CARB to 'determine what the statewide greenhouse gas emissions level was in 1990, and approve in a public hearing, a statewide greenhouse gas emissions limit that is equivalent to that level, to be achieved by 2020.' [Citation.] The Legislature also directed CARB to prepare a 'scoping plan' to identify how to achieve the "maximum technologically feasible and cost-effective reductions in greenhouse gas emissions . . . by 2020.' [Citation.] The scoping plan prepared by CARB explained that ' "[r]educing greenhouse gas emissions to 1990 levels means cutting approximately 30 percent from business-as-usual emission levels projected for 2020, or about 15 percent from today's levels." [Citation.] The scoping plan then set out a "comprehensive array of emissions reduction approaches and tools" to meet the goal, including expanding energy efficiency programs, achieving a statewide renewable energy mix of 33 percent, developing with our regional partners a cap-and-trade program for greenhouse gases, establishing targets and policies for emissions in transportation and implementing existing clean transportation programs, and creating targeted fees on certain activities affecting emissions.' " (*Cleveland Natl. Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 505.)

Regional Climate Action Initiative, the Mayor of Los Angeles' Executive Directive No. 10, and the Port of Los Angeles Climate Action Plan."

The trial court found that the discussion of impacts under GHG-2 is inadequate because it "does not inform the public or decision makers of the reasons it believes the project is consistent with . . . 'key legislation, regulations, plans and policies.' "[28] The court also observed that the analysis is "misleading" because "[a] project that will increase GHG emissions cannot be in harmony with state and local plans and policies that require a decrease in GHG emissions." We disagree.

In *Center for Biological Diversity v. Department of Fish and Wildlife* (2015) 62 Cal.4th 204, the court acknowledged that a comparison of the project's expected emissions to a hypothetical business-as-usual scenario is an appropriate "tool for evaluating efficiency and conservation efforts" and may be used "to show the project incorporates efficiency and conservation measures sufficient to make it consistent with achievement of A.B. 32's reduction goal, not to show the project will not increase greenhouse gas emissions over those in the existing environment." (*Id*. at p. 225.) GHG-2 properly uses such a comparative tool to show that shifting the drayage truck trips from the Hobart yard to the SCIG facility will increase the fuel efficiency of regional cargo movement and decrease GHG emissions, consistent with the goals of the scoping plan.

In *Center for Biological Diversity v. California Department of Fish and Wildlife*, *supra*, 62 Cal.4th at page 225 the court ultimately concluded that there was no substantial evidence for the finding that the project's emissions would not conflict with statewide emission reduction goals. Unlike in the present case, the lead agency in that case attempted to establish "consistency" with state plans and policies by showing that the "*project-level* reduction of 31 percent in comparison to business as usual is consistent

---

[28] The trial court also concluded that the analysis of GHG emissions under GHG-1 is deficient because it fails to consider the impacts of continued operations at the Hobart yard. As discussed above, we have rejected the argument that the effects of continued operations at Hobart are an indirect impact of the project that require analysis in the FEIR. For the same reason, we disagree that emissions at Hobart are required to be included in the analysis of the project's GHG emissions.

40

with achieving Assembly Bill 32's *statewide* goal of a 29 percent reduction from business as usual." (*Ibid.*) The court explained why this was inadequate as follows: "At bottom, the EIR's deficiency stems from taking a quantitative comparison method developed by the Scoping Plan as a measure of the greenhouse gas emissions reduction effort required by the state as a whole, and attempting to use that method, without consideration of any changes or adjustments, for a purpose very different from its original design: to measure the efficiency and conservation measures incorporated in a specific land use development proposed for a specific location. The EIR simply assumes that the level of effort required in one context, a 29 percent reduction from business as usual statewide, will suffice in the other, a specific land use development. From the information in the administrative record, we cannot say that conclusion is wrong, but neither can we discern the contours of a logical argument that it is right. The analytical gap left by the EIR's failure to establish, through substantial evidence and reasoned explanation, a quantitative equivalence between the Scoping Plan's statewide comparison and the EIR's own project-level comparison deprived the EIR of its ' "sufficiency as an informative document." ' " (*Id*. at p. 227.) In the present case, the harbor department did not purport to measure "consistency" with a specific quantitative reduction goal. The harbor department separated its quantitative analysis (GHG-1) from its qualitative analysis (GHG-2), informing the reader that emissions will exceed baseline levels, resulting in a significant impact, but that the project is consistent with state and local plans and policies that encourage adoption of more efficient use of fossil fuels to move goods. This analysis is particularly apt in this instance where the no project alternative also results in significant impacts and is not consistent with conservation goals. Accordingly, there is no inadequacy in the FEIR's analysis of GHG emissions.

### Disposition

The judgment granting respondents' petition for writ of mandate is affirmed in part and reversed in part. The judgment is affirmed insofar as it grants the consolidated petitions for a peremptory writ of mandate directing respondents to set aside certification of the FEIR and specified actions and approvals predicated on the certification, and to

suspend project activities until respondents have taken the necessary actions to comply with CEQA. Insofar as the judgment implies that compliance with CEQA requires correction of inadequacies in the FEIR's analysis of air quality impacts, particularly impacts to ambient air pollutant concentrations and cumulative impacts of such pollutant concentrations, the judgment is affirmed. Insofar as the judgment implies that compliance with CEQA requires correction of deficiencies in the FEIR's analysis of impacts related to the Hobart railyard, GHG emissions, noise, transportation and the cumulative impact of ICTF on noncancer health risks, and specification of mitigation measures AQ-9, NOI-1 and NOI-3, the judgment is reversed. On remand, the trial court may reconsider its award of costs. The parties shall bear their respective costs on appeal.

                                                           Pollak, Acting P.J.

We concur:

Siggins, J.
Jenkins, J.

| | |
|---|---|
| Counsel for defendants and appellants: | Office of the City Attorney of Los Angeles<br>Michael N. Feuer, Janna B. Sidley, Joy M. Crose<br><br>The Sohagi Law Group, Margaret M. Sohagi |
| Counsel for real party in interest and appellant: | Gibson, Dunn & Crutcher<br>Theodore J. Boutrous, Jr., Kahn A. Scolnick, and Daniel M. Kolkey<br><br>Munger, Tolles & Olson<br>Benjamin J. Horwich and Usha C. Vance<br><br>Meyers, Nave, Riback, Silver & Wilson<br>Amrit S. Kulkarni, Julia L. Bond, and Peter S. Hayes |
| Counsel for amicus curiae on behalf of appellants: | Klapach & Klapach and Joseph S. Klapach for The Los Angeles Coalition for the Economy & Jobs<br><br>Reed Smith LLP<br>Dennis Peter Maio for Regents of the University of California<br><br>Pillsbury Winthrop Shaw Pittman<br>Mark E. Elliott and Kevin M. Fong for Association of American Railroads<br><br>UCLA School of Law<br>Sean B. Hecht and Julia Forgie for California Communities Against Toxics; California Safe Schools; Communities for a Better Environment; Del Amo Action Committee; and Mothers of East Los Angeles; NAACP Wilmington-San Pedro |
| Counsel for plaintiffs and respondents: | Shute, Mihaly & Weinber<br>Rachel B. Hooper, Winter King, and Susannah T. French<br><br>Daniel P. Selmi<br><br>Charles Parkin, City Attorney and Michael J. Mais, Assistant City Attorney for City of Long Beach |

Kurt R. Wiese, General Counsel, Barbara Baird, Chief Deputy Counsel, Veera Tyagi, Principal Deputy District Counsel, and Mary J. Reichert, Senior Deputy District Counsel for South Coast Air Quality Management District

David R. Pettit, Melissa Lin Perrella, Morgan Wyenn, and Ramya Sivasubramanian for East Yard Communities for Environmental Justice; Coalition for Clean Air; Century Villages at Cabrillo; and Natural Resources Defense Council, Inc.

Johnson, Smith & Foy
Abigail A. Smith and Kimberly A. Foy for Coalition for a Safe Environment; Apostolic Faith Center; and Community Dreams; California Kids IAQ

Chatten-Brown & Carstens
Douglas P. Carstens and Michelle Black for Long Beach Unified School District

Peterson Law Group
John S. Peterson and Stacy W. Thomsen for Fast Lane Transportation, Inc.; California Cartage Company, Inc.; Three Rivers Trucking, Inc.; and San Pedro Forklift, Inc.

Counsel for intervener and respondent: Xavier Becerra, Attorney General, Sally Magnani, Senior Assistant Attorney General, Sarah E. Morrison, Supervising Deputy Attorney General, Catherine M. Wieman and Brian J. Bilford, Deputy Attorneys General

A148993